1

2

3

4

5

6

UNITED STATES DISTRICT COURT

7

CENTRAL DISTRICT OF CALIFORNIA

8

9

Case No. 8:10ML 02151 JVS (FMOx)

10

IN RE: Toyota Motor Corp.
Unintended Acceleration Marketing,
11 Sales Practices, and Products Liability
Litigation

Order Granting Motion for Final
Approval of Proposed Class Action
Settlement, and Granting Motion for
12

Attorneys' Fees, Reimbursement of
Expenses, and Compensation to
13 This document relates to:
Named Plaintiffs

14 All Economic Loss Cases.

15

16

17

18

19

20

21

22

23

24

25

1

Table of Contents

2

I.      Introduction  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  1

II.     Allocation Plan  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  3

III.    Objections  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  7

IV.     Conclusion  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  11

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    Presently before the Court are Motions filed by the Economic Loss Plaintiffs

2    ("Plaintiffs") seeking final approval of the proposed class action settlement,

3    including an award of attorney fees, costs, and payments to named plaintiffs and

4    class representatives.  (Docket Nos. 3555-56.)  As set forth herein, the Court grants

5    the Motions, and grants final approval to the proposed settlement.

6

7    Filed concurrently herewith are the Court's Final Order Approving Class

8    Action Settlement and the Court's Final Judgment.  Attached hereto as

9    Attachments 1 and 2 are, respectively, the Court's June 17, 2013 Order Regarding

10   Proposed Class Action Settlement[1] (Docket No. 3804) and the Court's June 17,

11   2013 Order Regarding Motion for Attorneys' Fees, Reimbursement of Expenses,

12   and Compensation to Named Plaintiffs (Docket No. 3802).  The Clerk is directed

13   to file a copy of this Order on the docket of each economic loss member case

14   number appearing on Attachment A to the Final Judgment.

15

16   I.    Introduction

17

18   At a fairness hearing held on June 14, 2013, and as discussed in previous

19   Orders, the Court at length considered the proposed settlement of the economic

20   loss class actions of this multi-district litigation ("MDL") and objections to that

21

22

23   _____

24   [1]  This Order itself has two attachments, designated Attachments A and B.
     Respectively, Attachments A and B set forth a list of objections to the proposed
25   settlement and a detailed explanation of the valuation of the proposed settlement.

1

settlement.  (See Docket Nos. 3802 & 3804.)[2]  In those Orders, although the Court found the proposed settlement to be fair, adequate, and reasonable (and thus, in effect tentatively approved the proposed settlement), the Court nevertheless held the Motions in abeyance (and thus, in effect withheld final approval).  (Approval Order at 48.)   The Court held the Motions in abeyance to consider supplemental briefing after additional details regarding allocation of the settlement funds became available.[3]  (See Docket No. 3808 (providing for supplemental briefing).) The parties filed their supplemental briefing and evidence on July 12, 2013, styled as a Joint Statement in Support of Amendment No. 2 to Settlement Agreement for Final Settlement Approval ("Jt. Stmt.") and the Third Declaration of settlement administrator Markham Sherwood.  (Docket Nos. 3883-84.)

After consideration of the issues presented in the original Motions referenced above, the parties' supplemental briefing, the evidence of record on the issue of both preliminary and final approval of the (amended) Settlement

---

[2]  For full context, this Order should be read in conjunction with the Court's June 17, 2013 Order Regarding Proposed Class Action Settlement (Docket No. 3804) ("Approval Order") and the Court's June 17, 2013 Order Regarding Motion for Attorneys' Fees, Reimbursement of Expenses, and Compensation to Named Plaintiffs (Docket No. 3802) ("Attorney Fee Order").  Both Orders are attached hereto.

[3]  One other issue that remained pending after the fairness hearing has been resolved without the need for supplemental briefing.  Specifically, on June 17, 2013, the parties' stipulation regarding the applicability of the release of claims in the Settlement Agreement to claims asserted by putative class members in the Brake MDL.  (See Approval Order at 42-43; cf. In re Toyota Motor Corp. Hybrid Brake Marketing, Sales Practices, and Products Liability Litig., 8:10-ML-02172 (Docket No. 503) (approving stipulation).)

1  Agreement, and the statements of counsel and objectors at both hearings on these

2  matters, the Court grants the Motion for Final Approval of Proposed Class Action

3  Settlement.

4

5       Moreover, as set forth fully in the Attorney Fee Order, the pendency of the

6  Motion for Final Approval was the only impediment to granting the Motion for

7  Attorney Fees, Reimbursement of Expenses, and Compensation to the Named

8  Plaintiffs.  With the Court's final approval of the Settlement Agreement, as

9  amended, that impediment has been removed, and the Court therefore grants the

10  Motion for Attorney Fees, Reimbursement of Expenses, and Compensation to the

11  Named Plaintiffs.

12

13  II.    Allocation Plan

14

15       As noted in the Court's Approval Order, aided by the settlement

16  administrator, just before the fairness hearing on June 14, 2013, Plaintiffs outlined

17  proposed changes to the Settlement Agreement's Allocation Plan.  Specifically, the

18  parties anticipated that all claimants would be reimbursed at 100 percent the

19  calculated value of their claims, regardless of jurisdiction, that there would be

20  sufficient funds to reimburse Toyota for the costs of class administration, and that

21  the remaining funds would be distributed to those non-claimant class members

22  who can be identified.  Spillover *cy pres* contributions would be eliminated, and

23  where class members fail to cash settlement checks, their share of settlement funds

24  would be escheated pursuant to applicable State law.

25

The parties have now memorialized their articulated plan in their Second Amendment to the Settlement Agreement.[4]

In keeping with this plan, the parties, together with the settlement administrator, have collected additional data and provided further analysis regarding amounts anticipated to be paid out to each class member. The settlement administrator has provided updated information regarding the amount to be paid out on existing claims, has provided updated estimates on the amount to be paid out on claims filed on or before the claims deadline,[5] and has calculated the expected residual amount in both the Alleged Diminished Value Fund and the Cash-in-Lieu-of-BOS Fund.[6] From that estimate, the settlement administrator has prepared a chart setting forth examples of estimated payments to non-claimants from each fund, factoring in variables such as the actual amount of diminished value and the sliding scale of recovery based on jurisdiction as described in the

_____

[4] The First Amendment is found at Docket No. 3424 at 10-14. Both relate to the same two subsections, and the Second Amendment effectively supersedes the First Amendment. (See Docket No. 3884-1 (Second Amendment).)

[5] The claims period has not yet closed, but the July 29, 2013 deadline is looming. The Court recognizes that the estimates provided by the settlement administrator are just that: estimates. Nevertheless, the settlement administrator's estimates are based on past experience in handling class action claims such as those at issue here, and the Court finds those estimates to be sufficiently reliable to grant final approval. Although the actual number of claimants versus non-claimants may not be exactly as estimated, no significant deviation from the estimate is expected. In any event, the residual amount in each fund is expected to be substantial enough that the estimated payout to non-claiming class members will not change to a significant degree.

[6] Certain totals may require adjustment. (See, e.g., Third Sherwood Decl. (Docket No. 3884) ¶ 6.).)

Approval Order.  (Approval Order at 8.)  The settlement administrator also provided, for comparison purposes, the amounts that would have been paid if there had been full participation by class members in the claims-filing process. (Compare Third Sherwood Decl. ¶¶ 9-10 (charts depicting anticipated payments to non-claimant class members under current Allocation Plan), with id. ¶¶ 12-13 (charts depicting likely payments to class members under original Allocation Plan).)

        With this additional briefing and evidence, the Court concludes that the parties have now satisfied the requirement of Rule 23(e)(3) of the Federal Rules of Civil Procedure to identify the terms of the settlement. (Cf. Approval Order at 12-13 (finding requirement not met, scheduling additional hearing, and providing for supplemental briefing).)

        More fundamentally, the additional briefing and evidence reinforces the Court's initial tentative conclusion that the proposed settlement is fair, adequate, and reasonable.  The claimants are rewarded for their minimal (yet helpful) effort in filing claims.  Specifically, these class members facilitated the parties' and the settlement administrator's information-gathering duties by participating in the claims-filing process, and as a result, they are to be paid 100 percent of the calculated value of their claims.  No deduction will be made to the value of their claims for attorney fees, settlement administration costs, or litigation expenses.

        Additionally, despite the failure to file claims, the vast majority of non-

claimant class members[7] will nevertheless share the residual value of the two funds, the total of which is expected to exceed $350 million.  These payments represent a significant portion of the amount they would have received under the original terms of the proposed settlement.  (Compare Third Sherwood Decl. ¶¶ 9-10, with id. ¶¶ 12-13.)  Distribution of payments to non-claimants is possible because reliable data on class membership is available to the settlement administrator, and such distribution is made more feasible because the reliability of that data has been improved through the updates to outdated contact information during the class notice process. (See Approval Order at 13-14.)  Thus, because the amount of residual funds is high, and because distribution of those funds to non-claimant class members is feasible, such distribution is desirable.

Moreover, where non-claimant class members are identified, but do not cash settlement checks, the settlement administrator's resort to state escheatment procedures ensures that the settlement amounts will remain available to non-claimant class members for the maximum extent allowed by state escheatment laws.

Overall, the Allocation Plan pays claimants at a higher rate, which is fair in light of their assistance facilitating the settlement by providing information and making timely claims.  Non-claimants, who have provided no such assistance,  are nevertheless to be paid a significant share of what they would have recovered

_____

[7]  Absent self-identification through the filing of claims, a small minority of non-claimant class members are not identifiable through existing data. (Jt. Stmt. at 3 n.6.)

under the original Allocation Plan if they had filed claims.  The only cost of

litigation to be shared by class members is the relatively minimal cost of settlement

administration.[8]   Additionally, by utilizing state-law escheatment processes as the

payment of last resort for uncashed settlement checks, the parties effectively permit

class members a longer period of time to claim their portion of the proposed

settlement.


        Thus, as discussed herein, the parties have fairly and reasonably resolved the

Court's remaining concerns regarding the proposed settlement, and the Court

grants final approval of the Settlement Agreement, as amended.


III.    Objections


        In both the Approval Order and the Attorney Fee Order, the Court discussed

objections to the proposed settlement and the attorney fee award at length.  When it

ordered supplemental briefing, the Court granted an additional opportunity for the

filing of objections.  (See Docket No. 3808 (objections to be filed no later than July

17, 2013).)  The Court intended any further objections be limited to matters

discussed in the supplemental briefing.[9]  Pursuant to the Court's Order, two

_____

        [8]  Of the $500 million available for cash payments to the class, the $25
million settlement administration costs are relatively minimal, totaling only
approximately 5 percent of the value of the cash funds.

        [9]  For this reason, the Court declined to hear from counsel for Objectors
Brenda Howell and Clarence Morrison at the July 19, 2013 hearing.  (See Docket
No. 3633.  Nevertheless, as indicated by the Court at the hearing, the Court
previously considered—and rejected—the objections raised by Howell and

1  additional objections were filed by counsel in a timely manner.  (<u>See</u> Docket Nos.

2  3887-88 (Guerriero and Boles Objections).)  Other objections were mailed to

3  Court, and the Court directed the Clerk to file them. (<u>See</u> Docket No. 3903-06 &

4  3908. (Objections of Ferdinand Fueller, Judi Lapoint, Mary Marcellino, Sydna

5  Lucey, and Estate of Bernstein).)

6

7          The Court has previously addressed the substance of most of these

8  objections.  First, in one instance, Objectors Gary and Rebecca Guerriero merely

9  purport to reassert their previously filed objection by incorporating it by reference

10  in their latest filing.  (<u>See</u> Docket No. 3887 at 2 (citing Docket Nos. 3632 &

11  3683).)  The Court previously addressed the substance of these objections in the

12  Approval Order; thus, no further discussion is warranted.  Second, the positions

13  articulated by Daniel J. Wood, Mary Marcellino, Judi Lapoint, Ferdinand Fueller,

14  and Sydna Lucey are similar to those raised by other Objectors.  The Court

15  addressed these arguments in the Approval Order and the Attorney Fee Order.

16  (<u>See</u> Approval Order at 13-15 (finding class notice met due process and Rule

17  23(e)(1) requirements), 10 & 35 (settlement waiver provision expressly excludes

18  claims for property damage or personal injury), 35-36 (finding the beginning and

19  ending dates for the sale window and early lease termination window to be

20  supported by uncontroverted expert analysis), & 40 (permissible to exclude

21  recovery past maintenance and repairs ostensibly related to SUA); Attorney Fee

22

23  ───────────────

24  Morrison.  (<u>See</u> Attorney Fee Order at 16-17 (rejecting argument that fee award
   should be limited to a small percentage of the total award in so-called "mega fund"

25  cases).)

Order at 16-19 (addressing objections to amount of attorney fees).)

The most recent objection filed by Objectors Angela C. Boles, Wayne Harris, and Julie Rainwater warrants further discussion. (Docket No. 3888.) Essentially, these Objectors again contend that the proposed settlement does not provide for recovery of floor mat-related expenses by vehicle owners. (Cf. Docket No. 3594.) Previously, the Court discussed at length the reasons why it finds that the terms of the proposed settlement are fair, adequate, and reasonable as a whole. (Approval Order at 17-30.) As noted repeatedly by the Court, the proposed settlement represents rational tradeoffs of risk and recovery on both sides. (Id. at 18-27, 30, 34-35 & 38-39.) To the extent that Objectors believed that the proposed settlement left them uncompensated (or unfairly compensated) because of any characteristics peculiar to their own losses, they were afforded the opportunity to opt out. (Id. at 15-16.) Objectors failed to avail themselves of that opportunity.[10] (Cf. Second Sherwood Decl. (Docket No. 3734) Ex. A (list of opt-outs).) These Objectors are represented by able counsel; thus, the Court presumes their failure to opt out is a reasoned judgment rather than a chance occurrence or uninformed choice.[11]

_____

[10] To the contrary, based on representations made by Class Counsel at the June 14, 2013 fairness hearing, the Court infers that these Objectors filed timely claims. (See June 14, 2013 Tr. at 41 (representing that as a result of the proposed settlement, Objectors Boles and Rainwater are eligible for installation of BOS, and Objector Harris is eligible for payment from the Alleged Diminished Value Fund).)

[11] Also falling into this category is the unique objection raised by the Estate of Bernstein. (Docket No. 3908.) The Estate's objection focuses on economic losses suffered by vehicle owners who have experienced alleged actual incidents of SUA, and the Estate argues that such economic loss claims should be valued more

1    Moreover, to the extent that Objectors contend that no provision has been

2    made for recovery regarding floor mat-related issues or that "Amendment No. 2 is

3    structured in a manner to expressly avoid providing any floor mat-related

4    compensation," they are simply wrong.  (Docket no. 3883 at 1.)  First, as outlined

5    by Toyota in its Reply, floor-mat issues were addressed by a separate recall that

6    offered replacement of floor mats (and carpet cleaning, where necessary).  (Docket

7    No. 3728 at 20-22.)  There is no expiration date on this recall and class members

8    who are eligible for replacement floor mats may still seek this remedy.  (Id. at 22.)

9    Additionally, the Objectors' argument overlooks the fact that the BOS installation

10   is specifically intended by the parties to remedy floor mat entrapment.  (Approval

11   Order at 37.)

12

13   These Objectors also contend that any use of state escheatment procedures

14   should be considered another form of spillover *cy pres* contributions.  (Docket No.

15   3888 at 4.)  The Court disagrees.  Escheatment earmarks funds for class members,

16   to be held by the states until class members comply with procedures to release

17   _____

18   highly than claims of class members who have not experienced SUA.  (See id. at

     2.)  As indicated in its filings, the Estate clearly understood it could have chosen

19   exclusion from the class, but it did not, and the Court presumes this is a reasoned

     judgment based on the relative value of the claim at issue.  (See id. at 6.)

20   Nevertheless, that the Estate would have preferred a settlement that compensated

21   more fully its peculiar loss does not render the settlement unfair, inadequate, or

     unreasonable.  Neither Rule 23 nor due process concerns require that a settlement

22   be perfect in all respects or even that it be the best possible settlement; rather, what

23   is required is a class action settlement that is fair, adequate, and reasonable.

     Hanlon v. Chrysler Corp., 150 F.3d 1011, 1027 (9th Cir. 1998).  For the reasons set

24   forth here and in the Court's previous Orders, the Court has found the proposed

25   settlement meets that standard.

10

those funds to them.  This arrangement does not fall into the definition of *cy pres* contributions.  Moreover, two rounds of checks and a reminder notice will be sent to class members before escheatment occurs.  This procedure does not, as Objectors contend, "keep[] consideration from Settlement Class Members."  (Id.) To the contrary, it facilitates distribution of such consideration to class members.

Thus, the newly filed objections do not detract from the Court's finding that the proposed settlement is fair, adequate, and reasonable.

IV.    Conclusion

As set forth herein, and as discussed extensively in the Approval Order and the Attorney Fee Order,[12] the Court finds that the proposed amended Settlement Agreement represents a settlement to the class that is fair, adequate, and reasonable.  The Court finds that, as amended, the Allocation Plan sets forth a reasonable plan of distribution to both claimants and non-claimants in a principled manner that is fair to all class members.

For that reason, the Court grants the Motion for Final Approval of Proposed Class Action Settlement.

Moreover, because the pendency of the Motion for Final Approval was the only impediment to granting the Motion for Attorney Fees, Reimbursement of

---

[12]  As noted previously, the Approval Order and the Attorney Fee Order are attached hereto as Attachments 1 and 2, respectively.

1    Expenses, and Compensation to the Named Plaintiffs, and because that impediment

2    has now been removed, and the Court also grants the Motion for Attorney Fees,

3    Reimbursement of Expenses, and Compensation to the Named Plaintiffs.

4

5        **IT IS SO ORDERED.**

6

7    DATED: July 24, 2013

8                                                    _____

9                                                    JAMES V. SELNA
                                                     UNITED STATES DISTRICT JUDGE

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2

3                            **ATTACHMENT 1**

4                  **Approval Order (MDL Docket No. 3804)**

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2

3

4

5

6                    UNITED STATES DISTRICT COURT

7                    CENTRAL DISTRICT OF CALIFORNIA

8

9                                          Case No. 8:10ML 02151 JVS (FMOx)

10   IN RE: Toyota Motor Corp.
     Unintended Acceleration Marketing,
11   Sales Practices, and Products Liability      Order Regarding Proposed Class
     Litigation                                   Action Settlement

12

13   This document relates to:

14   All Economic Loss Cases.

15

16

17

18

19

20

21

22

23

24

25

Table of Contents

I.    Background . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II.   Class Definition . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

III.  Terms of Settlement, Allocation Plan and Scope of Release of Claims . . . . 3
      A.    Terms of Settlement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
                          1.    Alleged Diminished Value Fund . . . . . . . . . . . . . 4
                          2.    BOS Installation and Cash-in-Lieu of BOS
                                Installation Fund . . . . . . . . . . . . . . . . . . . . . . . . . 5
                          3.    Customer Support Program . . . . . . . . . . . . . . . . 6
                          4.    Safety and Education Fund . . . . . . . . . . . . . . . . 7
      B.    Allocation Plan . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7
      C.    Scope of Release . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

IV.   Legal Standards Applicable to Class Action Settlement Approval . . . . . . 11
      A.    Rule 23(e) Requirements . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11
      B.    Appropriateness of Continued Certification of the Class . . . . . . . . 12

V.    Evaluation of Rule 23(e) Requirements . . . . . . . . . . . . . . . . . . . . . . . . . . 12
      A.    Rule 23(e)(3) – Parties Must Identify the Terms of the Settlement
            . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12
      B.    Rule 23(e)(1) – Notice to the Class . . . . . . . . . . . . . . . . . . . . . . . 13
      C.    Rule 23(e)(4) – Opportunity to Opt Out and Rule 23(e)(5) –
            Opportunity to Object . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15
      D.    Rule 23(e)(2) – Settlement Must be "[F]air, [R]easonable, and
            [A]dequate" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17
                          1.    *Hanlon* Factors . . . . . . . . . . . . . . . . . . . . . . . . . . 17
                                a.    Strength of the Plaintiffs' Case . . . . . . . . . . . . . . 18

b. Risk, Expense, Complexity, and Likely Duration of Further Litigation ............................. 21

c. Risk of Maintaining Class Action Status Throughout the Trial ............................................ 24

d. Amount Offered in Settlement ................... 25

e. Extent of Discovery Completed and the Stage of the Proceedings .............................. 26

f. Experience and Views of Counsel ................ 27

g. Presence of a Governmental Participant ........... 28

h. Reaction of the Class Members to the Proposed Settlement ................................ 29

2. Ruling ......................................... 30

VI. Contribution to the Safety and Education Fund ..................... 31

VII. Objections to Settlement ...................................... 32

A. Overall Fairness and Sufficiency of Settlement ................ 34

B. Sale Window and Early Lease Termination Window ........... 36

C. BOS Installation and Cash-in-Lieu-of-BOS Fund .............. 37

D. Customer Support Program ............................... 40

E. Other Objections ....................................... 41

1. Objections to Attorney Fees and Compensation of Named Plaintiffs ..................................... 41

2. Scope of Release .................................. 41

3. Applicability of Release to Claims Asserted by Putative Class in Hybrid Brake MDL ............................. 42

4. Claims Process .................................... 44

5.   Standing . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

6.   Objections Based on Disability  . . . . . . . . . . . . . . . . . . . . . . . . 45

7.   Manifestation States  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

8.   Ohio and Pennsylvania . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

VIII.  Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

Presently before the Court is a Motion filed by the Economic Loss Plaintiffs ("Plaintiffs") seeking final approval of the proposed class action settlement. (Docket No. 3555-56.)  A number of objections to the proposed settlement and award of fees, costs, and class representative compensation have been filed.[1]  The Toyota Defendants and Plaintiffs have filed Reply briefs in support of the settlement.  (Docket Nos. 3728 & 3731.)

As set forth more fully below, generally, the Court believes that the proposed settlement is fair, adequate, and reasonable.  Nevertheless, as articulated in detail herein, certain difficulties in the plan of allocation of the settlement funds preclude the Court's final approval of the proposed settlement at this time.  Accordingly, and with the following discussion, the Court holds in abeyance the Motion for Final Approval of Class Action Settlement.

I.   Background

On December 28, 2012, on application from the Economic Loss Plaintiffs, this Court granted preliminary approval to a proposed settlement agreement.[2]  (See Docket Nos. 3344-45 ("Preliminary Approval Orders").)  After preliminary approval, the parties amended two terms of the proposed settlement agreement relating to the circumstances under which any excess in each of the two cash funds

---

[1]  The objections are discussed herein at length.  See infra section VII.

[2]  The proposed settlement agreement was reached with the assistance of Court-appointed Settlement Special Master Patrick A. Juneau.  (See Docket No. 2462.)

1

might flow into each other.  (Docket No. 3424.)  Moreover, in their Reply, based on new information regarding the claim filing rates, Plaintiffs outlined changes to the plan of how to allocate the two cash settlement funds.  On the morning of the fairness hearing, the parties presented a further refinement on the allocation issue. The terms of the settlement agreement, as amended, are summarized in a separate section, below.

II.    Class Definition

Plaintiffs filed a copy of the Settlement Agreement with their application for preliminary approval of the proposed settlement.[3]  The Settlement Agreement sets forth a precise definition of the Settlement Class.  Specifically, subject to exclusion of certain persons affiliated with or employed by Toyota,[4] the parties' counsel, and the Court,[5] the Settlement Class is defined as:

> [A]ll persons, entities or organizations who, at any time as of or before the entry of the Preliminary Approval Order, own or owned,

---

[3]  The Settlement Agreement is attached as an unenumerated Exhibit to Plaintiffs' Ex Parte Application for preliminary approval of the settlement. (See Docket No. 3342-1 at 1-56.)  The Settlement Agreement is also available at the settlement website, www.toyotaelsettlement.com.  All otherwise undesignated section symbols in this Order refer to the Settlement Agreement.

[4]  The Settlement Agreement defines "Toyota" as "Toyota Motor Corporation and Toyota Motor Sales, U.S.A., Inc." (§ I(47).)  Throughout this Order, the Court uses the term as it is defined by the parties.

[5]  Also excluded are certain family members of such persons.  (§ I(13).)

purchase(d), lease(d) and/or insure(d) the residual value, as a Residual Value Insurer, of all Subject Vehicles equipped or installed with an ETCS (as listed in Exhibit 10) distributed for sale or lease in any of the fifty States, the District of Columbia, Puerto Rico and all other United States territories and/or possessions.

(Settlement Agreement § I(13) (defining "class").)  As noted above, the make, model, and years of the "Subject Vehicles" are set forth in tabular form in Exhibit 10 to the Settlement Agreement.  (Docket No. 3342-1 at 269-71.)  The Subject Vehicles include several year models of the Toyota 4Runner, Avalon, Camry, Celica, Corolla, FJ Cruiser, Highlander, Land Cruiser Prius, RAV4, Sequoia, Sienna, Supra, Tacoma, Tundra, Venza, and Yaris.  (Id. at 270.)  Also among the Subject Vehicles are several year models of the Lexus ES, GS, GX, HS, IS, LS, LX, RX, and SC.  (Id.)  Finally, the Subject Vehicles list also includes several year models of the Scion xB, xD, and tC.  (Id. at 270-71.)  The earliest model year is 1998 for certain Toyota and Lexus models; the latest model year is the 2010 model year for a majority of the models of all three makes of vehicle, Toyota, Lexus, and Scion.  (Id.)

III.   Terms of Settlement, Allocation Plan and Scope of Release of Claims

A.   Terms of Settlement

The current terms of the proposed settlement, as reflected by the Settlement Agreement, as modified, may be described as follows.

Generally, the proposed Settlement consists of four parts: (1) cash payments totaling $250 million for diminution of resale value of certain vehicles due to the alleged defects; (2) installation by Toyota dealers of a brake-override system ("BOS") for certain eligible vehicles,[6] and cash payments (totaling another $250 million) in lieu of such installation to most of the remaining Subject Vehicles; (3) establishment by Toyota of a Customer Support Program ("CSP"); and (4) establishment by Toyota of an Automobile Safety and Education Fund ("Safety and Education Fund").  Upon this Court's final approval of the proposed settlement, Toyota will fund a Qualified Settlement Fund ("the Fund") for payments to class members in the amount of $500 million. (§§ II(A)(1), (2) & (4).)

### 1.    Alleged Diminished Value Fund

This fund consists of a $250 million allocated to cash payments for diminished value for class members who took certain actions in a sixteen-month period of time, from September 1, 2009, to December 31, 2010.[7]  (§ II(A)(2).) These actions include sale by class members of a Subject Vehicle, return of a leased Subject Vehicle before lease termination, possession of a Subject Vehicle that was declared a total loss, or payment as a residual value insurer on a leased Subject Vehicle due to lease termination before the lease termination date.  (Id.)

---

[6] This subset of the Subject Vehicles is referred to as "BOS-Eligible Vehicles."  (§ I(3) & Ex. 11 (list of BOS-Eligible Vehicles).)

[7] In discussing this provision, the Court refers to this period as "the sale window."

Also included are payments to certain class members who reported an alleged actual incident of sudden, unintentional acceleration ("SUA") to Toyota, a Toyota Dealer, or the National Highway Traffic and Safety Administration ("NHTSA"). Any such class member who did so and who returned a leased Subject Vehicle before the lease termination date and before December 1, 2012,[8] is also eligible for a cash payment from this fund.

### 2.  BOS Installation and Cash-in-Lieu of BOS Installation Fund

Second, as part of the Settlement, Toyota will offer to install a BOS in excess of 3.55 million Subject Vehicles.[9]  This portion of the settlement is valued at approximately $400 million.  (Bonne Decl. (Docket No. 3557) ¶ 10 (valuing BOS installation at $111.50 per vehicle); Motion at 29 (representing number of eligible vehicles to be 3,581,477); Pltfs.' Reply at 24 & n.61 (multiplying the 3,581,477 vehicles eligible for BOS installation by $111.50 yields a total value of

_____

[8]  Likewise, the Court refers to this period as "the early lease termination window."

[9]  The Settlement Agreement estimated this number at 2.7 million Subject Vehicles, plus another 550,000 Subject Vehicles as to which Toyota previously offered to install a BOS, but which have not had a BOS installed, for a total of 3.25 million.  (§ II(A)(3).)  Plaintiffs now estimate that the total number of vehicles (including the 550,000) is approximately 3.5 million, with BOS installation being offered to over 3 million Subject Vehicles for the first time as a result of the proposed settlement. (Compare § II(A)(3) with Pltfs.' Reply at 23.)  Other Subject Vehicles, identified as the hybrid Subject Vehicles, are not offered BOS installation because those Subject Vehicles already have a system that performs a similar function.  (§ II(A)(3); see also Ptlfs.' Reply at 14 n.33 (estimating that there are 1.325 million hybrid Subject Vehicles).)

$399,334,685).)

Class members who own Subject Vehicles not eligible for BOS installation will receive a cash payment in lieu of such installation, and an additional $250 million contribution to the Fund will be made for this purpose. (§ II(A)(4).)

3.    Customer Support Program

Third, Toyota will implement a CSP to effectively provide a form of extended warranty coverage for repairs and adjustments to certain components of the Subject Vehicles for a number of years. (§ II(A)(5).) The mileage and term limitations of the CSP are more fully described in the Long Form Notice. (Ex. 4 § C(8)(d).) This program provides coverage for repairs and adjustments to correct defects in materials or workmanship related to the acceleration system. "The covered parts are the (i) engine control module; (ii) cruise control switch; (iii) accelerator pedal assembly; (iv) stop lamp switch; and (v) throttle body assembly." (Id.)

This program is valued in excess of $475 million. (Kleckner Decl. (Docket No. 3558) ¶ 11.)[10]

_____

[10]  Plaintiffs' expert witness, Kirk D. Kleckner, has set forth the bases underlying his valuation of the CSP. The Court finds that the Kleckner opinion is both reliable and relevant. See Fed. R. Civ. 702; Kumho Tire Co. v. Carmichael, 526 U.S. 137, 147 (1999); Daubert v. Merrell Dow Pharm., 509 U.S. 579, 597 (1993).

1        4.      Safety and Education Fund

2

3        Finally, Toyota will contribute $30 million to fund automobile safety

4    research and education related to issues in the litigation.  (§ II(A)(6).)  "The fund

5    will be divided between university-based automobile/transportation research

6    institutes and education/information programs for automobile drivers."  (Id.)  A

7    number of universities have submitted research proposals to be funded from this

8    portion of the settlement.  (See Berman Decl. (Docket No. 3565) ¶ 138 & Exs. F-L

9    (Docket No. 3565-5 to 3565-10).)  Generally, these proposals combine aspects of

10   driver behavior and automotive technology to enhance vehicle safety.  (See Motion

11   at 23-24 (describing five proposals).)

12

13       B.      Allocation Plan

14

15       The parties continue to adjust the Allocation Plan as additional data becomes

16   available from the settlement administrator.  Further details are expected to be

17   made available to Court in the next month.  The summary set forth below

18   incorporates the changes presented by the parties at the fairness hearing.  It also

19   assumes, as counsel currently anticipate, that there will sufficient funds to satisfy

20   all claims made, the class administration costs, and that additional payments to

21   non-claimants will be made.

22

23       After the claimants are paid out of the Alleged Diminished Value Fund and

24   the Cash-in-Lieu-of-BOS Fund, any excess will go toward satisfying the costs of

25

1   class administration.[11]  After those are satisfied, the residual will be directly

2   distributed to class members who did not file claims.  Initial settlement checks will

3   be sent, and by their terms will expire after 90 days.  Thereafter, the settlement

4   administrator will send a second settlement check, also good for 90 days, to any

5   class member who does not cash or deposit his or her first settlement check.  A

6   reminder notice will be sent to any class member who does not cash or deposit his

7   or her check after 60 days.  Should any class member fail to cash or deposit his or

8   her second settlement check, those funds will be escheated pursuant to applicable

9   State law.[12]

10

11       As to both cash funds, the Settlement Agreement clearly recognizes the

12   central significance of the manifestation issue and its impact on the viability of the

13   claims of class members.  The issue of manifestation under the laws of two states,

14   Florida and New York, is discussed at length in the Court's previous Order.  (See

15   Docket No. 2496 at 8-30.)  Protocols for this allocation are set forth in the record.

16   (Settlement Agreement, Ex. 16 (Docket No. 3342-1 at 289-97; see Berman Decl.

17   ¶¶ 96-100.)  Notably, allocation is expressed in percentage terms and varies among

18   states based on the laws of those states.  (Id.)  Overall, at one end of a sliding scale

19   of recovery are class members in states that clearly do not require manifestation of

20   a defect to support a defect claim, who will receive the largest cash payments (100

21

22       [11]  This includes "the cost of Settlement notice and claims administration."

23   (§ II(B)(1).)

24       [12]  State escheat laws would allow a class member to claim payments for a
    number of years.  See generally, Cal. Code Civ. Pro. §§  1500-82 (California's
25   Unclaimed Property Law ("UPL")).

percent).  (Id.)  At the other end of that sliding scale are class members in states
that clearly require defects to be manifested, who will receive the smallest cash
payments (30 percent).  (Id.)  Class members in states where the law is unclear as
to this requirement will receive cash payments in between the two (70 percent).
(Id.)

        In their Reply, aided by information received from the class administrator,
Plaintiffs suggest changes to the Allocation Plan that reduce the practical
significance of this distinction, at least as to class members who file claims.
Specifically, based on the current claims rate, it is anticipated that payments to
class members who have filed claims in manifestation-required and "unclear"
jurisdictions are likely to be paid at the full 100 percent rate (rather than at the
reduced 30 percent and 70 percent rate).  (Pltfs.' Reply (Docket No. 3731) at 3-4.)
This is anticipated for claims against both funds.[13]  Moreover, as indicated at the
fairness hearing, as to the Alleged Diminished Value Fund, it is anticipated that
claims filers will receive 100 percent of the value of their claims.[14]

        C.     Scope of Release

        The Settlement Agreement contains a broad release provision, releasing

---

[13]  Class members who fail to file claims will still be subject to this sliding
scale.

[14]  As noted *infra* section V.D.1, the fund represents 42 percent of the total
loss to the class as calculated by Plaintiffs' expert.  Class members who file claims
will receive a higher percentage of their actual loss than will non-claimants.

Toyota from claims that were or that could have been brought in the present multi-district litigation ("MDL"):

> In consideration for the Settlement, Class Representatives, Plaintiffs and each Class Member, . . . finally and forever release, [Toyota and associated entities and individuals] from . . . any claim . . . arising from, related to, connected with, and/or in any way involving the Actions, the Subject Vehicles, any and all claims involving the ETCS, any and all claims of unintended acceleration in any manner that are, or could have been, defined, alleged or described in the [operative pleadings filed in the present MDL], including, but not limited to, the design, manufacturing, advertising, testing, marketing, functionality, servicing, sale, lease or resale of the Subject Vehicles.

(§ VI(B).)  Notwithstanding this broad release provision, the Settlement Agreement expressly preserves each class member's claims for personal injury, wrongful death, or actual property damage:

> Notwithstanding the foregoing, Class Representatives, Plaintiffs and Class Members are not releasing claims for personal injury, wrongful death or actual physical property damage arising from an accident involving a Subject Vehicle.

(§ VI(C).)

1    IV.    <u>Legal Standards Applicable to Class Action Settlement Approval</u>

2

3           A.    <u>Rule 23(e) Requirements</u>

4

5           To protect the due process rights of absent class members, class action

6    settlements require the Court's approval.  For a class judgment to bind an absent

7    class member, due process requires that the absent class members receive adequate

8    notice and representation by the class representative.  <u>See</u> <u>Richards v. Jefferson</u>

9    <u>County, Ala.</u>, 517 U.S. 793, 799-802 (1996); <u>Phillips Petroleum Co. v. Shutts</u>, 472

10    U.S. 797, 812 (1985); <u>Hansberry v. Lee</u>, 311 U.S. 32, 42-43 (1940); <u>Hanlon v.</u>

11    <u>Chrysler Corp.</u>, 150 F.3d 1011, 1020 (9th Cir.1998); <u>Moralez v. Whole Foods</u>

12    <u>Mkt., Inc.</u>, 897 F. Supp. 2d 987, 997 (N.D. Cal. 2012).

13

14           Consistent with this principle, Rule 23(e) of the Federal Rules of Civil

15    Procedure sets forth procedural requirements for approval of class action

16    settlements.  The parties seeking approval must file a statement identifying the

17    terms of the settlement.  Fed. R. Civ. P. 23(e)(3).  Where, as here, a proposed

18    settlement would bind the class members, the Court must direct notice to the class

19    to be effectuated in a reasonable manner.  Fed. R. Civ. P. 23(e)(1).  Class members

20    must be given the opportunity to opt out of the settlement, and they must be given

21    the opportunity to file objections thereto.  Fed. R. Civ. P. 23(e)(4)-(5).  The Court

22    may approve a binding class settlement only if the Court finds that the proposed

23    settlement is "fair, reasonable, and adequate."  Fed. R. Civ. P. 23(e)(2).

24

25           A discussion of how the proposed settlement meets these requirements is

discussed below.

### B.   Appropriateness of Continued Certification of the Class

The Court preliminarily certified the class, specifically finding that the class was ascertainable and that it met the Rule 23(a) and Rule 23(b)(3) requirements for class certification.  (See generally Docket No. 3344.)  Nothing has changed in the five-month period between that preliminary class certification and today that suggests to the Court that the class should be decertified.  Accordingly, for the reasons specified in the Order granting preliminary approval of the proposed settlement, the Court certifies the Class for purposes of the Settlement.  (See id. at 3-13.)

### V.   Evaluation of Rule 23(e) Requirements

### A.   Rule 23(e)(3) – Parties Must Identify the Terms of the Settlement

Plaintiffs filed a comprehensive Settlement Agreement, subject to the Court's approval, with their Ex Parte Application for preliminary approval.  The Agreement incorporates a number of Exhibits thereto, including an Allocation Plan. (Settlement Agreement Ex. 16 (Docket No. 3342-1 at 289-97.)  The parties amended their settlement agreement as noted *supra* section III.A.

As noted in Plaintiffs' Reply brief, and summarized *supra* section III.B., based on additional information now available from the settlement administrator,

Plaintiffs have at least tentatively altered the Allocation Plan. (Pltfs.' Reply (Docket No. 3731) at 3-8.) Because the Allocation Plan is such an integral part of effectuating the proposed settlement, the Court cannot conclude that the parties have met their Rule 23(e)(3) burden to identify the terms of the settlement.

In so concluding, the Court notes that it is unsurprising that the Allocation Plan has not been finalized. The present case involves millions of class members, and the claims filing deadline of July 29, 2013, has not yet passed. Thus, the Court does not fault the parties, their counsel, or the settlement administrator on this point. In the coming weeks, the parties anticipate additional information will become available that will assist them in more clearly defining the settlement terms. At the fairness hearing, the Court set a schedule for additional briefing, set a deadline for further objections by class members, and set the matter for further hearing on July 19, 2013, at 9:00 a.m. (Docket No. 3787.)

### B. Rule 23(e)(1) – Notice to the Class

The Court gave approval to the parties' plan for class notice when it preliminarily approved the proposed settlement. (Docket No. 3345 at 5-7.) A description of how notice to the class was effectuated is found in the declaration of the settlement administrator. (See generally Sherwood Decl. (Docket No. 3559) ¶¶ 6-17.) Among other sources, the settlement administrator used current address data gathered from computerized account information from Departments of Motor Vehicles in the United States using Vehicle Identification Number patterns of the Subject Vehicles. (Id. ¶¶ 6-9.) Notices were mailed to more than 22 million

Case 8:10-ml-02151-JVS-FMO   Document 3963   Filed 06/17/13   Page 33 of 105   Page
ID #:124554

individuals.  (<u>Id.</u> ¶ 10.)  Another approximately 15,000 class notices were sent to
owners of fleet vehicles.  (<u>Id.</u> ¶ 11.)  Although a significant number of notices were
returned for bad addresses, after the settlement administrator performed address
searches and re-mailed the notices, the settlement administrator reports a 97
percent successful delivery rate.  (<u>Id.</u> ¶ 14.)

In conjunction with direct notice by mail, other methods of notices were
employed.  The settlement administrator set up an interactive website to provide
information and allow class members to file claims.  (<u>Id.</u> ¶¶ 15-17.)  The website
has generated significant traffic.  As of April 19, 2013, over 365,000 electronic
claims were filed, and the website registered over 16 million "hits."  (<u>Id.</u> ¶ 17.)

The settlement administrator has also responded to in excess of 11,000 email
communications.  (<u>Id.</u> ¶ 22.)  Phone calls to a toll-free telephone number have
numbered over 186,000, with over 35,000 calls transferred to a live operator after
listening to an initial "frequently asked questions" ("FAQ") option.  (<u>Id.</u>)

Additionally, the parties mounted an aggressive paid media campaign to
provide notice.  (<u>See generally</u> Kinsella Decl. (Docket No. 3561).)  The Summary
Settlement Notice appeared in newspaper supplements, national consumer
magazines, and newspapers.  (<u>Id.</u> at ¶¶ 13-15.)  Additionally, significant internet
banner advertisements were also placed.  (<u>Id.</u> at ¶ 17.)  Combined, these
placements afforded class members hundreds of millions of opportunities to be
exposed to the Summary Settlement Notice.  (<u>Id.</u> at ¶¶ 13-17.)

On these facts, the Court concludes that notice to the class was reasonable, and that it meets the requirements of both Rule 23(e)(1) and due process of law.[15]

C.   Rule 23(e)(4) – Opportunity to Opt Out and Rule 23(e)(5) – Opportunity to Object

The over 22 million Short Form Notices sent to class members advise them of the opportunity to exclude himself or herself from the settlement and to object to the settlement; and that the deadline for doing so was May 13, 2013.  (Sherwood Decl. Exs. A-B.)  It also directed class members to the settlement website for complete information.  (Id.)

The settlement website provides information on "Class Member Options," including the option to "Exclude yourself" from the settlement.  The "FAQ" portion of the website sets forth a straightforward procedure for opting out of the

---

[15]  The Court agrees that the proposed changes to the Allocation Plan do not require additional direct notice to the class.  (See Pltfs.' Reply at 8-11.)  Here, as explained above, changes to the Allocation Plan will either increase amounts paid to class members who filed claims, provide benefits to non-claimants even though they failed to comply with the requirements of filing a claim, or both.  Where the benefit to the class is increased by changes to proposed class action settlements, courts have held that supplemental direct notice to the class is not required.  See, e.g., Union Asset Mgmt. Holding A.G. v. Dell, Inc., 669 F.3d 632, 641 (5th Cir. 2012), cert. denied, 133 S. Ct. 317 (2012); In re Integra Realty Res., Inc., 262 F.3d 1089, 1111 (10th Cir. 2001).  This is so because an increase to a class member's recovery is not the type of change that would cause a class member to request exclusion from the class settlement.  See, e.g., Achtman v. Kirby, McInerney & Squire, LLP, 464 F.3d 328, 338 (2d Cir. 2006); Manners v. Am. Gen. Life Ins. Co., 1999 WL 33581944, at *13 (M.D. Tenn. Aug. 11, 1999).

settlement.  Class members were informed they could do so by mailing a letter
including basic information regarding themselves and their vehicle.

Likewise, the settlement website informs class members of the option to
"Object" or "Write to the Court about why you don't like the proposed settlement."
The settlement website FAQs explain the procedure for making objections.

Class members may also download a Long-Form Notice from the website.
The Long-Form Notice likewise explains the procedures for opting out and filing
objections.  (Sherwood Decl. Ex. C.)

As of the Court-imposed deadline, 77 objections have been received, and
approximately 2,000 class members have elected to opt out of the settlement.
(Berman Reply Decl. (Docket No. 3722) Exs. A1-76 (copies of objections); Docket
No. 3743; Second Sherwood Decl. (Docket No. 3734) ¶ 8 & Ex. A (list of opt-
outs).)[16]

On these facts, the Court finds that the class members were sufficiently
advised of their rights to object to and to exclude themselves from the proposed
settlement.

_____

[16]  The settlement administrator received 26 late opt-out requests.  The Court
is inclined to grant a five-day grace period and allow opt-out requests postmarked
on or before May 18, 2013, shall be considered timely.  The Court adopted a
similar approach in filing objections made by pro se Objectors and received by the
Court in the days after the deadline.

D.   Rule 23(e)(2) – Settlement Must be "[F]air, [R]easonable, and [A]dequate"

1.   *Hanlon* Factors

In evaluating fairness, the Court must consider and give approval to the proposed settlement as a whole, rather than any individual provision therein.[17]  See Hanlon, 150 F.3d at 1026-27.  A number of factors govern the Court's consideration of the settlement:

the strength of the plaintiffs' case; the risk, expense, complexity, and likely duration of further litigation; the risk of maintaining class action status throughout the trial; the amount offered in settlement; the extent of discovery completed and the stage of the proceedings; the experience and views of counsel; the presence of a governmental participant; and the reaction of the class members to the proposed settlement.

Id. at 1026 (quoted and applied most recently in Lane v. Facebook, Inc., 696 F.3d 811, 819 (9th Cir. 2012)).  When the settlement precedes class certification, settlement approval requires a "higher standard of fairness."  Hanlon, 150 F.3d at 1026.  The reason for this is to ensure that counsel and named plaintiffs do not

---

[17]  Nevertheless, the proposed settlement at issue here involves a number of specific individual provisions.  The Court's discussion of the individual issues is not meant to detract from its responsibility to give or deny final approval of the settlement as a whole.

1    benefit themselves disproportionately at the expense of absent class members.

2    whose interests  Id. at 1027.

3

4            The Court considers the Hanlon factors.

5

6                    a.        Strength of the Plaintiffs' Case

7

8            This factor considers both the likelihood of success on the merits and the

9    range of possible recovery. See Rodriguez v. W. Publ'g Corp., 563 F.3d 948, 964-

10   65 (9th Cir. 2009).  In considering the probability success on the merits, there is no

11   "particular formula by which that outcome must be tested."  Id. at 965.  To the

12   contrary, the Court's consideration of the likelihood of success on the merits is

13   "nothing more than an amalgam of delicate balancing, gross approximations and

14   rough justice." Officers for Justice v. Civil Serv. Comm'n of San Francisco, 688

15   F.2d 615, 625 (9th Cir. 1982) (internal quotation marks and citation omitted).

16   Moreover, the Court need not "reach any ultimate conclusions on the contested

17   issues of fact and law which underlie the merits of the dispute, for it is the very

18   uncertainty of the outcome in litigation and avoidance of wasteful and expensive

19   litigation that induce consensual settlements."  Id.  Because absolute precision is

20   impossible, "ballpark valuations" are the permissible, especially when reached

21   after mediated negotiation among non-collusive parties.  See Rodriguez, 563 F.3d

22   at 965 ("We put a good deal of stock in the product of an arms-length,

23   non-collusive, negotiated resolution . . . .").

24

25           Plaintiffs have won a number of legal victories in the present MDL.

Although a number of their claims have been dismissed as not legally cognizable, Plaintiffs have asserted a number of claims upon which they could ultimately prevail.  (See generally Docket Nos. 510 & 1414 (amended by Docket No. 1623).) As discussed more fully below, their continued litigation is not without its risks, but neither can the Court characterize Plaintiffs' case as weak.  The Court believes that the amount offered in settlement strikes an appropriate balance between the strength of Plaintiffs' claims and the risks of continued litigation.

Initially, the Court notes that the sliding scale of recovery for class members in manifestation, unclear, and non-manifestation states aids in accounting for the varying strengths and weaknesses among the class as to state-law claims.  In this manner, the parties have attempted to make a first rough cut between Plaintiffs with the strongest claims and Plaintiffs with weaker claims.[18]

Furthermore, the Alleged Diminished Value Fund is to be funded at 42 percent of the actual calculated diminished value on all Subject Vehicles sold or exchanged within the sale window or the early lease termination window.[19]

---

[18]  The changes proposed to the Allocation Plan eliminate this distinction for those class members who filed claims.  If the funds are sufficient to eliminate this distinction and to pay each class member at the top of the sliding scale, the Court does not believe doing so detracts from the reasonableness of the proposed settlement.  The Court's point here is that if such a distinction is necessary, it strikes a permissible balance.  Moreover, as the Court understands the current proposal, this distinction will still be employed in calculating payments to non-claimants.

[19]  Plaintiffs' expert witness, Ernest H. Manuel, Jr., Ph.D., has set forth the bases for this valuation.  The Court finds this opinion is both reliable and relevant.

(Manuel Decl. (Docket No. 3560) ¶ 35; Berman Decl. ¶ 90.) This percentage reflects a good balance of the strength of Plaintiffs' case and risks associated with its weaknesses.  Cf. In re Mego Fin. Corp. Sec. Litig., 213 F.3d 454, 459 (9th Cir. 2000) (recovery of "roughly one-sixth of the potential recovery" was not unfair or inadequate in light of "the difficulties in proving the case"); In re Critical Path, Inc., C 01-00551 WHA, 2002 WL 32627559, *5 (N.D. Cal. June 18, 2002) ($17.5 million settlement where damages alleged were $200 million, resulting in 8.75 percent recovery percentage).

Class members eligible for BOS installation are to receive a specific remedy, sought from the outset of this litigation, that is likely to increase the safety of their vehicles and/or their confidence in the safety of their vehicles.[20]  Class members who instead participate in the Cash-in-Lieu-of-BOS Fund recover $125 (at the top of the sliding scale) based on a valuation of $111.50 for such installation as calculated by Plaintiffs' expert Michael Bonne.[21]  (Berman Decl. ¶ 90; Bonne Decl. (Docket No. 3557) ¶ 10.)  The Cash-in-Lieu-of-BOS Fund is funded at

---

See Fed. R. Civ. 702; Kumho Tire, 526 U.S. at 147; Daubert, 509 U.S. at 597.

[20] This distinction highlights the differences in the parties' basic litigation position.  Plaintiffs contend SUA is caused by defects in the Subject Vehicles; Toyota points to driver error, "sticky" accelerators, and floor mat entrapment as potential causes.  The settlement eliminates the need to resolve these hard-fought disputes as to the class claims.

[21] Like Plaintiffs' other experts, Michael Bonne has set forth the bases to this valuation.  The Court finds this opinion is both reliable and relevant.  See Fed. R. Civ. 702; Kumho Tire, 526 U.S. at 147; Daubert, 509 U.S. at 597.

approximately 25 percent of the possible recovery.[22]  (Bonne Decl. ¶ 10; Berman

Decl. ¶ 90; Ptlfs.' Reply at 14 n.34.)  As is the case with the Alleged Diminished

Value Fund, this percentage reflects a good balance of the strength of Plaintiffs'

case and risks associated with its weaknesses.


The CSP provides significant coverage, benefits 16.1 million class members,

and is valued in excess of $475 million.  (Berman Decl. ¶ 93; Kleckner Decl. ¶ 11.)


On the whole, the Court finds that the proposed settlement is a reasonable

reflection of the strength of Plaintiffs' case and represents a significant proportion

of Plaintiffs' range of possible recovery.  Thus, the Court finds this factor weighs

in favor of the settlement.


> b.  Risk, Expense, Complexity, and Likely Duration of
>      Further Litigation


Generally, "unless the settlement is clearly inadequate, its acceptance and

approval are preferable to lengthy and expensive litigation with uncertain results."

Nat'l Rural Telecomms. Coop. v. DIRECTV, Inc., 221 F.R.D. 523, 526 (C.D.

Cal.2004) (quoting 4 A Conte & H. Newberg, Newberg on Class Actions, § 11:50

at 155 (4th ed. 2002)).  This general rule is amplified in class actions, and certainly

applies with great force to the present one.  See Van Bronkhorst v. Safeco Corp.,

---

[22]  Moreover, on current claims volume, it is anticipated that claimants will
receive the full $125, regardless of the applicable jurisdiction.

529 F.2d 943, 950 (9th Cir. 1976) ("It hardly seems necessary to point out that there is an overriding public interest in settling and quieting litigation.  This is particularly true in class action suits which are now an ever increasing burden to so many federal courts and which present serious problems of management and expense." (footnote omitted)).

Unquestionably, the present litigation is complex. As Plaintiffs candidly acknowledge, their chance of success is uncertain.  (See Motion at 31-36.)  In their favor, Plaintiffs point to a demonstrable and statistically significant increased chance of SUA in the Subject Vehicles and allude to evidence that Toyota was aware of this and acted to conceal it.  (Id. at 31.)  Nevertheless, they also acknowledge success at trial is not assured.  (Id.)  Morever, Plaintiffs acknowledge Toyota's contention that SUA stems from driver error, and they acknowledge that NHSTA's investigations of SUA against other auto manufacturers have supported this contention.  (Id. at 31-32.)

Importantly, two interlocutory appeals are pending.[23]  The first challenges this Court's holding that Plaintiffs have Article III standing to assert their claims notwithstanding not having experienced an alleged actual incident of SUA.  (See Docket No. 1623.)  A contrary ruling in favor of Toyota on the standing issue

_____

[23]  These two interlocutory appeals are currently before the Ninth Circuit. The first is In re: Certain Economic Loss Plaintiff v. Toyota Motor Corp., et al., 11-57006, which has been ordered stayed pending this Court's final approval of the proposed settlement.  (See 11-57006 Docket No. 56.)  The second is In re Toyota Motor Corp., et al., 12-55659.  No formal stay has been entered on the docket of that case, although counsel's request to stay was filed December 27, 2012. (See 12-55659 Docket No. 24.)

would drastically alter the present case, as it is reasonably assumed that a majority of class members have not experienced an alleged incident of SUA. Also pending is an appeal of the Court's Order denying Toyota's Motion to Compel Arbitration. (Docket No. 2312.) A ruling in favor of Toyota on that issue would likewise remove the claims of a majority of class members from the Court's docket.

Moreover, the Court ruled on the legal issue of whether it could order injunctive relief in the form of repairs or adjustments to the Subject Vehicles, or whether NHSTA's finding of the lack of defect could be held to preclude such an order. (Docket No. 510 at 88-98.) A higher court could disagree with the Court's ruling.

Significantly, despite the volumes of expert reports developed by the parties, and despite repeated inspections and testing, Plaintiffs' experts have been unable to replicate the phenomenon of SUA. (See Motion at 34.) The significance of this fact cannot be overemphasized. Additionally, the proposed settlement was reached prior to the Court's ruling on a number of motions to exclude Plaintiffs' expert testimony. (Compare Docket No. 3332 (hearing set for January 11, 2013) with Docket No. 3444-45 (preliminarily approving proposed settlement on December 28, 2012).) The uncertainty of whether those reports would ultimately be found to be admissible further contributes to the risk of continued litigation.

Assuming Plaintiffs could clear these hurdles and receive judgment in their favor, a lengthy appeal period would likely follow. The out-of-pocket costs in this litigation have thus far totaled over $30 million. The current attorney fee lodestar

1    approaches $70 million.  Extraordinary amounts in additional costs, and certainly

2    additional attorney time would be incurred in continuing to litigate.

3

4           Given these facts, the Court easily concludes that continuing the present

5    litigation involves significant risk to the class.  The class is not assured of

6    prevailing on the merits.  The litigation undeniably presents complex issues, at

7    great expense, and there is no predicting the most likely outcome at the present

8    stage of litigation.  Continued litigation of Plaintiffs' claims is unlikely to be

9    resolved quickly, and any resolution by this Court is likely to be the subject of an

10   appeal.  If the proposed settlement is not effectuated, resolution is likely to take

11   years.  Thus, the Court easily concludes this factor weighs in favor of settlement.

12

13                  c.      Risk of Maintaining Class Action Status Throughout the

14                          Trial

15

16          The Court approved a single class for settlement purposes.  Absent

17   settlement, Toyota would likely oppose any motion for class certification and, as

18   noted by the Court in a previous Order, the laws of different states would likely

19   apply, necessitating multiple classes or subclasses of Plaintiffs. (See Order

20   Denying Plaintiffs' Motion for Application of California Law (Docket No. 1478.).)

21   Additionally, as to claims based on diminished value, Toyota stands prepared to

22   argue against one measure of damages for 20 different models of vehicles.  (See

23   Motion at 35-36 (discussing the critique of Plaintiffs' expert report on damages

24   authored Toyota's expert Dr. Edward Lazear).)

25

Nevertheless, assuming Plaintiffs would be successful in a quest to have some or all classes and/or subclasses certified, the Court could re-evaluate the appropriateness of class certification at any time.  See Fed. R. Civ. P. 23(c)(1)(c).

Moreover, a reversal on interlocutory appeal of the Court's ruling denying the Motion to Compel Arbitration would completely fracture the class.  The same is true if the Ninth Circuit were to hold the class members who have not experienced SUA lack standing to bring their claims.

Settlement avoids all possible risk.  Thus, the avoidance of risk of maintaining class action certification throughout trial favors settlement of this action.

### d.   Amount Offered in Settlement

To assess whether the amount offered is fair, the Court may compare the settlement amount to the parties' estimates of the maximum amount of damages recoverable in a successful litigation.  In re Mego Fin. Corp., 213 F.3d at 459. While settlement amounts that are close to the plaintiffs' estimate of damages provide strong support for approval of the settlement, a settlement that offers a lesser amount of the potential recovery does not preclude a finding of fairness.  Id. (finding settlement amount constituting one-sixth of the potential recovery was fair and adequate); see also Hanlon, 150 F.3d at 1027 (holding that the possibility that the settlement amount could have been greater "does not mean the settlement presented was not fair, reasonable or adequate.").  "This is particularly true in cases

1  . . . where monetary relief is but one form of the relief requested by the plaintiffs."
2  Officers for Justice, 688 F.2d at 628.

3

4  The amount offered in settlement is substantial, totaling in excess of $1.375
5  billion in value to be allocated directly to the class, and totaling in excess of $1.6
6  billion when separately negotiated fees and costs are added to that figure.  As noted
7  in connection with the first and second Hanlon factors, the Court believes the
8  amount in settlement sufficiently accounts for both the strength of Plaintiffs' case
9  and the risks associated with continued litigation.  This factor weighs in favor of
10 settlement.

11

12              e.    Extent of Discovery Completed and the Stage of the
13                    Proceedings

14

15     Consideration of the extent of discovery and the current stage of the
16 litigation allows the Court to evaluate whether the parties are able to make
17 decisions about their claims based on information received during the discovery
18 process.  See Linner v. Cellular Alaska P'ship, 151 F.3d 1234, 1239 (9th Cir.
19 1998); In re Cylink Sec. Litig., 274 F. Supp. 2d 1109, 1112 (N.D. Cal. 2003).
20 Where a settlement occurs in an advanced stage of the proceedings, this fact
21 supports a finding that the parties had the opportunity to investigate their claims
22 before resolving them.  Alberto v. GMRI, Inc., No. Civ. 07-1895 WBS DAD, 2008
23 WL 4891201, at *9 (E.D. Cal. Nov.12, 2008); Murillo v. Pac. Gas & Elec. Co.,
24 2:08-1974 WBS GGH, 2010 WL 2889728, at *8 (E.D. Cal. July 21, 2010).

25

Discovery was nearly completed at the time the proposed settlement was reached.  (See generally Berman Decl. ¶¶ 38-68.)  The parties engaged in extensive document discovery among themselves and third parties, including many types of electronically stored documents.  (Id. ¶ 38-56.)  The parties' experts analyzed the vehicle software and source code.  (Id. ¶ 57.)  The parties engaged over 40 expert witnesses, and took over 200 depositions.  (Id. ¶ 59-66.)

On this record, the Court concludes that all counsel had ample information and opportunity to assess the strengths and weaknesses of their claims and defenses.  Accordingly, this factor weighs in favor of settlement.

f.   Experience and Views of Counsel

This reliance is predicated on the fact that "[p]arties represented by competent counsel are better positioned than courts to produce a settlement that fairly reflects each party's expected outcome in the litigation." In re Pac. Enters. Sec. Litig., 47 F.3d 373, 378 (9th Cir. 1995). The recommendations of counsel are given great weight since they are most familiar with the facts of the underlying litigation. Nat'l Rural Telecomms., 221 at 528.  Additionally, where the services of a private mediator are engaged, this fact tends to support a finding that the settlement valuation by the parties was not collusive.  See, e.g., Lusby v. Gamestop Inc., C12-03783, 2013 WL 1210283, at *10 (N.D. Cal. Mar. 25, 2013); Villegas v. J.P. Morgan Chase & Co., CV 09-00261 SBA (EMC), 2012 WL 5878390 at *6 (N.D. Cal. Nov. 21, 2012); Hartless v. Clorox Co., 273 F.R.D. 630, 641 (S.D. Cal. 2011).

1    Plaintiffs' counsel support the proposed settlement.  (Motion at 42-43.)

2

3    g.    Presence of a Governmental Participant

4

5    Although no governmental entity is a party to this action, the proposed

6    settlement nevertheless bears the silent imprimatur of government approval

7    because despite receiving notice, no state or federal official has filed an objection

8    to the proposed settlement.

9

10    Specifically, in accordance with the governmental notice provision of the

11    Class Action Fairness Act ("CAFA"), 28 U.S.C. § 1715(a)-(b), on January 4, 2013,

12    the settlement administrator gave timely notice of the proposed settlement to the

13    United States Attorney General, as well the Attorneys General for each state, and

14    the Attorney General for all possessions and territories of the United States.[24]  (See

15    Sherwood Decl. ¶ 5; cf. Ex Parte Application for Preliminary Approval of

16    Settlement (Docket No. 3342, filed Dec. 26, 2012).)

17

18    "Although CAFA does not create an affirmative duty for either state or

19    federal officials to take any action in response to a class action settlement, CAFA

20    presumes that, once put on notice, state or federal officials will raise any concerns

21    that they may have during the normal course of the class action settlement

22

23    _____

24    [24]  This CAFA provision has two time requirements.  The first is a short time period for service of notice to government officials; the second requires the expiration of a 90-day period after notice before a Court may give final approval.

25    See 28 U.S.C. § 1715(b) & (d). The 90-day waiting period expired April 2, 2013.

procedures."  Garner v. State Farm Mut. Auto. Ins. Co., CV 08 1365 CW EMC,

2010 WL 1687832, at *14 (N.D. Cal. Apr. 22, 2010).  To date, no state or federal

official has raised any objection or concern regarding the settlement.[25]  Thus, even

though there is no governmental participant in the present action, the failure of any

Attorney General to object to the proposed settlement supports this Court's final

approval of the proposed settlement.


                    h.      Reaction of the Class Members to the Proposed

                            Settlement


        The absence of a large number of objections to a proposed class action

settlement raises a strong presumption that the terms of the settlement are favorable

to the class members.  Nat'l Rural Telecomms., 221 F.R.D. at 529; In re

Omnivision Techs., Inc., 559 F.Supp.2d 1036, 1043 (N.D. Cal. 2008); see, e.g.,

In re Mego Fin. Corp., 213 F.3d at 459 (one objection out of a potential class of

5400); Churchill Village, LLC v. Gen. Elec., 361 F.3d 566 (9th Cir. 2004) (500

opt-outs and 45 objections out of approximately 90,000 notified class members).


        As noted, class response has been overwhelmingly supportive of the

settlement.  Although 22 million class notices were sent, fewer than 2,000 class

members have asked to be excluded, and fewer than 100 have filed objections to

the settlement.  These numbers should be contrasted with the more than 422,000

claims submitted to the settlement administrator.  (Second Sherwood Decl. ¶ 5.)

_____

        [25]  Toyota so represents.  (Toyota Reply (Docket No. 3728) at 2-3.)  A
review of the MDL docket reveals no objection filed by any government official.

1    This factor weighs in favor of approval of the settlement.

2

3              2.    Ruling

4

5         All of the Hanlon factors favor settlement.  The proposed settlement

6    represents a significant portion of what Plaintiffs could expect to receive if they

7    prevailed on the merits, and the decision to settle their claims in this manner

8    represents a reasoned assessment of the risk and expense of continued litigation.

9    After most discovery was completed, the proposed settlement was negotiated

10   between informed counsel with the assistance of an exceptionally able and

11   experienced Court-appointed professional mediator.  The proposed settlement has

12   met with the presumed approval of over fifty governmental entities and of an

13   overwhelming majority of the class members who have made submissions to the

14   settlement administrator.

15

16        Accordingly, considering the Hanlon factors, the Court finds that the

17   proposed settlement is fair, reasonable, and adequate.

18

19   VI.   Contribution to the Safety and Education Fund

20

21        As noted previously, one element of the proposed settlement is the

22   establishment of a $30 million Safety and Education Fund.

23

24

25

1

2      Some objectors argue that this fund does not comply with Ninth Circuit

3  requirements regarding *cy pres* funds.[26]  However, the initial $30 million

4  contribution is not a *cy pres* contribution.

5

6      Not uncommon in class action settlements, *cy pres* is a shortened phrase that

7  refers to an ancient equitable doctrine "cy près comme possible," translated from

8  the French to "as near as possible." Dennis v. Kellogg Co., 697 F.3d 858, 865 (9th

9  Cir. 2012).  Pursuant to this doctrine, in class action settlements, federal courts

10  often authorize contributions, often charitable in nature, "'where the proof of

11  individual claims would be burdensome or distribution of damages costly.'"

12  Nachshin v. AOL, LLC, 663 F.3d 1034, 1038 (9th Cir. 2011) (quoting Six (6)

13  Mexican Workers v. Ariz. Citrus Growers, 904 F.2d 1301, 1305 (9th Cir. 1990)).

14  Such contributions are often made "in lieu of direct distribution of damages to

15  silent class members, [and] allows[] for aggregate calculation of damages, the use

16  of summary claim procedures, and distribution of unclaimed funds to indirectly

17  benefit the entire class." Dennis, 697 F.3d at 865 (internal quotation marks and

18  citation omitted).  Such contributions must "qualify as the next best distribution to

19  giving the funds directly to class members." Id. (internal quotation marks and

20  citation omitted).  To so qualify, such contributions must "retain[] some connection

21  to the plaintiff class and the underlying claims." Id.

22

23

24      [26] Other objections address provisions related to *cy pres* distribution of
    residual funds.  Under the parties' current proposal, those provisions have been
25  eliminated, and therefore those objections are moot.

1    Here, after the parties agreed to the establishment of two cash funds for the

2    class totaling $500 million, they separately negotiated the establishment of the $30

3    million Safety and Education Fund.  (Pltfs.' Reply at 33; Toyota Reply at 22-23.)

4    In this manner, the initial $30 million contribution did not diminish the cash

5    payments to the Class.  It is not made in lieu of any payments to the class.  Instead,

6    it is simply one part of a multi-part settlement of complex litigation that the Court

7    must consider as a whole.

8

9    Thus, the Court concludes the initial $30 million contribution to the

10   Education and Safety Fund is not a *cy pres* fund.  Objections on the basis that this

11   initial contribution does not comply with requirements for *cy pres* funds are

12   therefore lack merit.[27]

13

14   VII.   Objections to Settlement

15

16   A detailed listing of those objections is found on Exhibit A attached hereto.

17   Many of the objections were filed on the MDL Docket.  Others were sent directly

18   to counsel and/or the settlement administrator.  Class Counsel compiled a

19   comprehensive list of objections, regardless of whether they were filed with the

20   Court, sent to counsel, and/or sent to the settlement administrator.  That

21   compilation is found in tabular form attached as Appendix A to the Plaintiffs'

22

23   _____

24   [27]  While the size of the initial fund is significant, it is dwarfed by the
     balance of the settlement and does not materially diminish any portion of the
25   compensation class members will receive.

1   Reply.  (See Docket No. 3731-1.)[28]  Copies of all but four objections are attached

2   as Exhibits A1-76 to the Berman Reply Declaration.  (Docket No. 3722-1 to 3722-

3   13.)  An untimely objection from a disabled Objector appearing pro se was filed by

4   the Court,[29] and is found at Docket No. 3743.  Three other objections were filed on

5   the date of the fairness hearing. (Docket Nos. 3788-3790.)

6

7       Although many of the objections fail to conform in all respects with the

8   procedure established for making them, the Court has nevertheless reviewed and

9   considered all the objections that are part of the record.[30]  (Cf. Pltfs.' Reply at 12

10   n.24.)  The Court has also considered a number of supplemental filings by

11   Objectors, including corrections to previous submissions, inadvertently omitted

12   exhibits, statements of non-objections, and in one instance, a filing styled as a

13   "surreply" brief.  (See Docket Nos. 3608, 3619, 3667-68, 3683, 3708, 3741 &

14   3759.)

15

16       Generally, the objections either relate to the overall fairness and sufficiency

17

18       [28]  A complete listing of objectors is attached hereto as Attachment A.

19   [29]  This objection is untimely.  Nevertheless, to accommodate the Objector's

20   described disability, the Court filed the objection, and granted leave to the Objector
     to appear by phone.

21

22   [30]  Nevertheless, the Court strikes those portions of any objection that
     purports to incorporate the objections raised by others in other documents.  (See

23   Pltfs.' Reply at 56 & n. 171.)  The Court's Preliminary Approval Orders
     specifically required that "any objection [state] in writing and include . . . the

24   specific reasons why the Class member objects to the settlement (including any
     legal support) [and] any evidence or other information the objecting Class Member

25   intends to rely on."  (Docket No. 3345 at 9.)

of the settlement, or they address more specific elements of each of the four parts

of the proposed settlement, or they fall into a miscellaneous category.  The Court

has already discussed issues related to one of these four parts – the *cy pres*

contribution – in the previous section.  Below, the Court discusses objections

related to the overall fairness and sufficiency of the settlement, the three remaining

parts of the settlement, and a number of other objections that are not part of any

broader category.


A.    Overall Fairness and Sufficiency of Settlement


A number of objections object to the settlement as insufficient to fully

compensate the class generally or to fully compensate them for specific damages.

As discussed *supra*, the Court has determined that the overall amount and basic

structure of the proposed settlement is fair, adequate, and reasonable.


As a general matter, inherent in the concept of settlement is trading a portion

of a *possible* recovery for the *certainty* of some recovery.  This principle simply

highlights the inverse relationship between risk and reward.  Settlement is born of

compromise, and settling plaintiffs trade the risk of recovering nothing for a

reward that is necessarily less than their full *potential* recovery.  When a particular

tradeoff between the risk and the potential for reward is rationally made, and when

the resulting settlement is a fair, adequate, and reasonable result for the class, that

settlement is entitled to approval.  This is true even when the class must be content

with a less than full recovery of their actual damages.  As discussed *supra*, and as

acknowledged by Plaintiffs, the risk avoided by the proposed settlement should not

be understated.  (See Pltfs.' Reply at 17-18.)  Simply put, Plaintiffs might eventually recover more with continued litigation, but they also might recover nothing.  The proposed settlement strikes a fair balance.

Moreover, and importantly for those Objectors who claim actual damages for incidents of SUA, the proposed settlement has a carve out for such claims.  It expressly preserves "claims for personal injury, wrongful death or actual physical property damage arising from an accident involving a Subject Vehicle."  (§ VI(C).)  Thus, to the extent that a Plaintiff has been damaged based on an alleged actual incident of SUA, the proposed settlement does not apply to his or her claims arising from that incident.  Such claims are not extinguished by the proposed settlement, and any Plaintiff may continue to pursue recovery on an individual basis.[31]

Thus, the Court concludes that these objections are without merit.

B.      Sale Window and Early Lease Termination Window

Some objections addressed to the Alleged Diminished Value Fund relate to the beginning or ending dates of the sale window and the early lease termination window.  These Objectors find themselves ineligible for participation in the Alleged Diminished Value Fund because of the date they sold their vehicles or

---

[31]  Although not precluding such recovery, neither does the proposed settlement facilitate such recovery.  Rather, it is incumbent upon each Plaintiff to separately pursue his or her claim based on alleged actual incidents of SUA.

35

terminated their leases.  Although the Court is not unsympathetic to their personal

accounts of the disposition of their vehicles, the appropriate sale window and early

lease termination window was determined by Plaintiffs' expert based on extensive

analysis and statistical evidence.  (Manuel Decl. ¶¶ 18-19.)  As noted *supra* at

footnote 19, the Court finds this evidence based on sound methodology, and no

Objector has given the Court reason to exclude Dr. Manuel's conclusions regarding

the media events and market forces or their combined (but temporary) effect on

secondary market resale value for the Subject Vehicles.  (See generally id.)

        At least one Objector seeks damages for anticipated future loss in value

when she sells or trades in her vehicle.  Such damages are speculative.

        The objections raised regarding the sale window and early lease termination

window lack merit.

        C.    BOS Installation and Cash-in-Lieu-of-BOS Fund

        Some Objectors contend that BOS Installation provides no real benefit to the

class.  It is first helpful to understand what is meant by a BOS installation, and

what it is not.  Plaintiffs' expert explains that the BOS installation consists of a

"reflash" (or update) of the software in the engine control module ("ECM") of the

Subject Vehicles.  (Bonne Decl. (Docket No. 3557) ¶ 7.)  Thus, the "system"

referred to in the phrase "brake-override system" consists not of any particular

hardware installation; rather, it is the installation of a software "system" in the

ECM.

Moreover, it is also helpful to understand that in the context of the proposed settlement, BOS installation is not meant as a cure-all for SUA.  Instead, it is meant to remedy a specific condition Toyota has long contended is related to reports of SUA: floor mat entrapment.  (Pltfs.' Reply at 22.)  Ordinarily, drivers want the vehicle to stop, or they want the vehicle to go.  To effectuate their intent, they apply the brake, or they apply the accelerator until the desired result is achieved.  In normal driving conditions, conflicting inputs from the brake pedal and accelerator pedal simply should not ever occur.  However, with a floor mat entrapped under the accelerator pedal, when a rational driver applies the brakes to stop, the ECM receives conflicting inputs.  After BOS installation, these conflicting inputs will result in a reduction of engine power.  Thus, BOS installation has a value to the class, and it remedies a known condition that has a connection to SUA.

Nevertheless, BOS installation is not offered for all Subject Vehicles.  For instance, it is not offered for hybrid vehicles, including most notably all models of the Toyota Prius.  This is because a similar protection is already built into those models.  Thus, these vehicles already have the benefit offered by the BOS installation component of the proposed settlement, and the decision not to extend further benefits of this type is reasonable.

Still other Subject Vehicles will not be offered a BOS.  Instead, they are offered a cash payment in lieu of BOS, paid for all claimants and at the top of the sliding scale for non-claimants at $125.  Some Objectors contend that these cash payments do not fully compensate them or allow for installation of a BOS.

Plaintiffs' method of valuation is set forth in the Declaration of their expert, who
gathered data and arrived at an average flat rate charged by dealers for an ECM
reflash such as that required to complete the BOS installation contemplated by the
proposed settlement.  (Bonne Decl. ¶¶ 8-10.) Considering that a BOS installation is
just a software update rather than installation of new parts or new systems in an
existing vehicle, its relatively minimal stated value is unsurprising.


Some Objectors contend it is unreasonable to provide them with this cash
valuation if Toyota itself cannot or will not provide a BOS installation to them.
However, class counsel represents that the Subject Vehicles identified for
participation in the Cash-in-Lieu-of-BOS Fund fall into two categories.  (Pltfs.'
Reply at 22.)  First are vehicles that "were not subject to the floor mat entrapment
recall," and thus, are not subject to the danger described above of simultaneously
application of brake and accelerator.  For these vehicles, BOS installation would
not alleviate the known condition associated with SUA described above.
Therefore, the failure to offer a BOS installation on these Subject Vehicles is
understandable.


Second are vehicles "that do not have the capacity to accept the BOS reflash
without also replacing the engine control module."  (Id.)  Class counsel represent
that installation of BOS on these vehicles could be accomplished only by replacing
the ECM, which could be accomplished only at enormous cost.  (Id.)  Moreover,
because these vehicles are older, Toyota takes the position that its potential for
liability is low when one factors in its state-of-the-art defense that brake over-ride
systems were not in wide use at the times these vehicles were manufactured.  (Id.)

Thus, as to these Subject Vehicles, it is likely that Toyota assessed as very low its risk of liability, not warranting more than the negotiated compromise.  As noted above, just as settlements necessarily reflect a balancing of risk and reward for plaintiffs, for defendants, they reflect a balancing of the risk of liability and the cost of settlement.  The Court finds this portion of the proposed settlement represents a reasoned and reasonable compromise among the parties.

Thus, the Court finds that the objections related to the BOS installation and the Cash-in-Lieu-of-BOS Fund lack merit.

D.    Customer Support Program

Some Objectors contend the CSP lacks real value.  However, as outlined, this program provides specific, identifiable parts and systems subject to repair and adjustments, including the ECM, cruise control switch, accelerator pedal assembly, stop lamp switch, and throttle body assembly.  (See § II(A)(5).) Protection extends up to 10 years after expiration of existing warranties, and up to 150,000 miles. (Id.)  As noted *supra* footnote 10, the Court has found Plaintiff's expert valuation of approximately $475 million to be a helpful and reliable expert opinion, and no evidence to the contrary has been presented.

Other objections discuss costs associated with past repairs to their vehicles and object to the prospective nature of the repair or adjustments contemplated by the CSP.  Although the Court is not unsympathetic to these personal accounts of increased past repair costs, it is entirely appropriate to structure as part of a

settlement a customer support program that applies only to future claims. Importantly, as noted previously, any claims of property damage as a result of an alleged actual incident of SUA are not extinguished by the proposed settlement. (See *supra* section VI.A.)  In contrast, past maintenance and repair charges were not made part of the negotiated settlement and they are within the scope of the release, as least to the extent they are related to SUA.  Nevertheless, the failure of the parties to include a term to compensate class members for past repairs does not render the proposed settlement unreasonable.  Indeed, such a term inviting review of past repairs to over 16 million class vehicles would be difficult, if not impossible, to implement, and would serve to multiply individual disputes rather than resolve them on a classwide basis.[32]

Accordingly, these objections lack merit.

E.     Other Objections

1.     Objections to Attorney Fees and Compensation of Named Plaintiffs

Some Objectors contend the attorney fees and compensation of named Plaintiffs.  These objections are addressed in the concurrently filed Order Regarding Motion  for an Award of Attorneys' Fees, Reimbursement of Expenses, and Compensation to Named Plaintiffs.

---

[32]  Moreover, class members with past losses had the option of excluding their claims from the proposed settlement.

2.    <u>Scope of Release</u>

Some Objectors contend the release is too broad and releases claims regarding the Subject Vehicles, including, for example, a claim related to gas mileage.  The Court disagrees, except as noted in the next section.  The release is broad, but it clearly limits itself to claims "regarding the subject matter of the Actions."  (§ VI.B.)  Gas mileage is not at issue in the present action.

Other objections relate to the inclusion of a waiver of rights protected by California Civil Code § 1542, which preserves unknown claims:  "A general release does not extend to claims which the creditor does not know or suspect to exist in his or her favor at the time of executing the release, which if known by him or her must have materially affected his or her settlement with the debtor." Class settlements often waive this protection, and such waivers are not generally viewed as an impediment to class settlement.  <u>See, e.g.</u>, <u>Harris v. Vector Mktg. Corp.</u>, C-08-5198 EMC, 2011 WL 1627973, at *4 (N.D. Cal. Apr. 29, 2011); <u>In re PFF Bancorp, Inc.</u>, CV 08-01093-SVW PLAX, 2011 WL 4389323, at *6 (C.D. Cal. Apr. 27, 2011); <u>In re Phenylpropanolamine (PPA) Prods. Liab. Litig.</u>, 227 F.R.D. 553, 569 (W.D. Wash. 2004) (Appendix § 6.2); <u>Acosta v. Trans Union</u>, LLC, 243 F.R.D. 377, 383 (C.D. Cal. 2007); <u>In re Cisco Sys., Inc. Sec. Litig.</u>, C-01-20418-JW PVT, 2006 WL 6927885, at *8 (N.D. Cal. Sept. 12, 2006)  Indeed, in a case such as the present one, the Court is dubious as to whether the class claims could be settled absent such a waiver.

The objections based on the scope of the release and the inclusion of the

1    § 1542 waiver lack merit.

2

3           3.      Applicability of Release to Claims Asserted by Putative Class

4                   in Hybrid Brake MDL

5

6           Two Objectors contend the release is too broad and applies to overlapping

7    issues between the present MDL and In re Toyota Motor Corp. Hybrid Brake

8    Marketing, Sales Practices, and Products Liability Litig., 8:10-ML-02172 ("Brake

9    MDL").  These objections are raised by are Objector James Daniel, represented by

10   Joseph Dunn (Docket 3733-3 at 65-73), and Objector David Gelber, represented by

11   Paul Paradis of Horowitz, Horowitz & Paradis (interim lead counsel in Brake

12   MDL) (Docket 3733-5 at 21-35).

13

14          Some of the same vehicles are at issue in both the Brake MDL and the

15   present MDL.  Specifically, "Subject Vehicles" in the present MDL include the

16   2001 to 2010 models of the Toyota Prius.  (Docket 3342-1 at 270.)  At issue in the

17   Brake MDL are the 2004 to 2009 models of the Toyota Prius.

18

19          There also is arguably some overlap of substantive issues.  The present MDL

20   relates to alleged defects causing SUA.  The causes of SUA have not been

21   identified and, as noted previously, Plaintiffs' experts have been unable to replicate

22   SUA.  The Brake MDL relates to alleged defects in the anti-lock braking system

23   ("ABS").  The operative Consolidated Complaint in the present MDL refers in

24   passing to ABS Operation.  (See Docket No. 2836 ¶ 137 (referring to a press

25   release regarding Prius ABS as an example of Toyota's marketing campaign that

                                               42

1  promised safety in the Toyota brand) & ¶ 366(4) (alleging that "ABS Operation"

2  and other "design character tics" "gave Toyota 'definitive proof of root cause' of

3  UA).)

4

5        In the proposed settlement of the economic loss claims, the release language

6  does not expressly carve out claims asserted in the Brake MDL.  (Docket 3342-1 at

7  31-33.) On this specific point, the language of the release is ambiguous enough as

8  to be amenable to two contrary interpretations.  In correspondence to class counsel

9  and Toyota settlement counsel, counsel for David Gelber proposes an express

10  carve out provision be added to the release in the proposed settlement. (3733-5 at

11  23.)

12

13        Class counsel responds to this objection by simply stating that they do not

14  believe that the release in the present MDL has any effect on the Brake Class

15  Action. (Ptlfs.' Reply at 57.)  Toyota takes the contrary position. (Toyota Reply at

16  32-35 ("Applying this standard, Gelber's and Daniel's claims are appropriately

17  released because the allegations in Prius Brakes overlap in several important

18  respects with those asserted in this case.").)

19

20        As discussed at the hearing, through the efforts of counsel in the <u>Brake MDL</u>

21  and settlement counsel for Toyota, this issue is expected to be resolved shortly.

22  The parties have stipulated that Toyota agrees not to assert the release of claims in

23  the proposed settlement of the present MDL as a defense against any claim asserted

24  in the <u>Brake MDL</u> that is not based on dimunition in value.  That stipulation is

25  pending Court approval.

1       4.      Claims Process

2

3       Some Objectors complain that the claims process should not be required.

4   Although the data used by the settlement administrator to provide notice to class

5   members was reliable, it also required additional refinement.  (See, e.g., Second

6   Sherwood Decl. ¶ 8.)  The requirement that class members download a claim form

7   or request in writing a claim form, complete the form, and mail it back to the

8   settlement administrator is not onerous.  Additionally, in lieu of a written claim,

9   class members are given the what the Court considers the even less onerous option

10  of submitting an online claim.  Moreover, as currently proposed, the class members

11  who cooperate in settlement with the minimal effort of providing basic information

12  salient to their claims will be rewarded in many instances with a greater portion of

13  settlement than non-claimant class members who merely sit and wait, and who may

14  receive a check in the mail.  Therefore, these objections lack merit.

15

16      5.      Standing

17

18      Other Objectors contend that Plaintiffs lack Article III standing.  This Court

19  has discussed Article III standing at length, held that Plaintiffs did not lack

20  standing, and certified the Article III issue for interlocutory appeal.  (See Docket

21  No. 1623.)  The Court does not now revisit those rulings, and instead finds that the

22  objections based on standing lack merit for the reasons stated therein.

23

24

25

1    6.    Objections Based on Disability

2

3         One Objector identifies himself as disabled and has suggested the settlement

4    ought to contain more outreach to the hearing impaired.  He estimates that

5    approximately 1.8 million in the class are hearing impaired.  (See Docket No.

6    3733-2 at 49-56.)  The Court assumes the Objector proposes to accomplish this

7    through *cy pres* contributions.  The parties have eliminated the *cy pres* contribution

8    aspect of the proposed settlement; thus, objections related to the subject matter of

9    those contributions are moot.  As to the *cy pres* contributions that were

10   contemplated in the parties' previous proposal, although assistance to the disabled

11   is a noble cause, any focus through research or otherwise on the unique challenges

12   faced by hearing impaired drivers would tend to lack the required close nexus

13   between the class claims and *cy pres* contributions.  See Nachshin v. AOL, LLC,

14   663 F.3d 1034, 1040-41 (9th Cir. 2011).

15

16        This Objector also advocates for large print class notices.  (Id. at 56.)  The

17   Court's examination of the notices reveals the print size was sufficient.  Although

18   large print is easier to read for most people, the type size is adequate.  A good deal

19   of information needed to be communicated to class members, and larger type

20   would likely render class notice via postcard infeasible, thus significantly

21   increasing mailing costs that already exceed $6 million.

22

23        Thus, although raising valid points, this objection lacks merit in the sense

24   that the points raised do not detract from the proposed settlement.

25

7.    Manifestation States

Some Objectors contend that no relief should be given to Plaintiffs who live in the states that require manifestation of the defect.  Currently, the Allocation Plan sliding scale gives these Plaintiffs 30 percent of their base amount.  Like other portions of the proposed settlement, this term is simply the product of compromise.  It settles weaker, riskier claims for about one-third the amount of stronger, less risky claims.  That the Objectors may have made another bargain is beside the point; settling parties need not find the most ideal terms.  Moreover, had the parties completely excluded class members in manifestation states, class counsel would be challenged as abandoning a significant portion of the class with weaker claims in order to effectuate settlement for the portions with stronger claims.  The Court believes that the parties struck an appropriate balance.  The parties need only agree to terms that are "fair, adequate, and reasonable," and the Court finds that they have.  Objections based on the distinctions made in the Allocation Plan regarding the manifestation requirement lack merit.  Moreover, the revised Allocation Plan will in all likelihood eliminate the discounts for class members who file claims.

8.    Ohio and Pennsylvania

Relatedly, these Objectors also object to the Allocation Plan's identification of Ohio and Pennsylvania as non-manifestation states, which they contend is at

odds with the law of the case.[33]  In its June 8, 2011, Order, the Court identified Ohio and Pennsylvania as examples of states which would require manifestation of a defect prior to any recovery by a plaintiff.  See In re Toyota Motor Corp. Unintended Acceleration Mktg., Sales Practices, & Products Liab. Litig., 785 F. Supp. 2d 925, 932 (C.D. Cal. 2011) (relying on Velotta v. Leo Petronzio Landscaping, Inc., 69 Ohio St. 2d 376, 379 (1982) ("In a case such as this, where the wrongful conduct complained of is not presently harmful, the cause of action does not accrue until actual damage occurs."), and Angus v. Shiley Inc., 989 F.2d 142, 147 (3d Cir. 1993) (finding that the Pennsylvania Supreme Court would find "no basis for relief" stated in the complaint where plaintiff's heart valve was allegedly defected but had manifested no defect)).

Plaintiffs' counsel contend that other authority in Ohio and Pennsylvania reveal otherwise.  (Pltfs.' Reply at 43-44 & nn. 128-29 (citing cases).)  Without an exhaustive inquiry into this question, the Court notes that, upon examination of the authority cited by Plaintiffs, there is a sufficient foundation for Plaintiffs' good faith position that Ohio and Pennsylvania are properly classified as non-manifestation states.[34]  Thus, this point does not render the Allocation Plan unfair,

_____

[33]  Characterizing the Court's discussion of this issue as "law of the case," overstates its importance, which the Court views as non-binding dicta.  Therein, denying a motion to apply the law of California to a nationwide class, the Court made the point, by way of example, that other states were not so generous to consumers, and that a number of states, including Ohio and Pennsylvania, would require manifestation of a defect prior to permitting claims.

[34]  The Court also notes the lack of any other objections regarding the parties' classification of states as manifestation, unclear, or non-manifestation

1    inadequate, or unreasonable.

2

3         These objections are therefore without merit.

4

5    VIII.  Conclusion

6

7         The Court believes that the proposed settlement is in broad measure fair,

8    adequate, and reasonable.  Having considered the objections, the Court finds that

9    they lack merit and do not preclude final approval.  Nevertheless, the difficulties

10   with the Allocation Plan as it is currently drafted preclude final approval at this

11   time.  Accordingly, the Court holds in abeyance the Motion for Final Approval of

12   Class Action Settlement.

13

14        **IT IS SO ORDERED.**

15

16   DATED:     June 17, 2013

17                                        _____

18                                        JAMES V. SELNA
                                          UNITED STATES DISTRICT JUDGE
19

20

21

22

23

24   _____

25   states.

**ATTACHMENT A:  TABLE OF OBJECTORS**

| IN RE: TOYOTA MOTOR CORP. UNINTENDED ACCELERATION MARKETING, SALES PRACTICES, AND PRODUCTS LIABILITY LITIGATION This Document Relates to: ALL ECONOMIC LOSS ACTIONS | Case No. 8:10ML2151 JVS (FMOx) Copies of the Objections Referenced Below Appear on the MDL Docket at Docket Nos. 3722-1 to 3722-13, 3743 & 3788-3790. ___ |
| --- | --- |

| No. | Objector | Model/ Year |
| --- | --- | --- |
| 1 | Abrazado, Charmain | 2007 Scion TC |
| 2 | Anderson, Randy | 2007 FJ Cruiser |
| 3 | Ashcom, Timothy | 2009 Scion xB |
| 4 | Baker, Carolyn A. | 2007 Sequoia |
| 5 | Bandas, Robert | 2007 FJ Cruiser |
| 6 | Boles, Angela Harris, Wayne Rainwater, Julie | 2010 Camry 2005 Tacoma 2008 Tundra |
| 7 | Barretta, Lucy | 2009 & 2010 Corolla |
| 8 | Berkely, Joy Moroz, Lisa | 2010 RAV4 |
| 9 | Bernstein, Jerome (Estate of) | 2010 Corolla |
| 10 | Blake, Cindy | 2002 4Runner |
| 11 | Blake, Donna | 2002 Camry |
| 12 | Bouganim, Hara Ann | 2002 Prius |
| 13 | Cakarcan-Sbabo, Gamze | 2005 Corolla |
| 14 | Campos, Manuel & Yenisei | 2006 Camry |
| 15 | Falls Auto Gallery Tracy Sivillo | 15 vehicles |
| 16 | Carpenter, Darrel L. | 2005 Tacoma |
| 17 | Clinch, Peter | 2007 FJ Cruiser |
| 18 | Ranieri, Ameila Huang, Housan | 2007 Lexus ES350 2005 Camry |
| 19 | Colburn, Debora | 2009 Tacoma |
| 20 | Compton, Louis Robert | 2006 Camry |
| 21 | Cooper, Robert | 2009 Corolla |
| 22 | Copeland, Christi | 2004 4Runner |
| 23 | Daniel, James | 2009 Prius |
| 24 | Dannemiller, Barbara | 2006 Tundra |
| 25 | Davis, Sidney | 2002 Camry |
| 26 | Ducote, Dan | 2010 Sequoia |
| 27 | Egge, Brian | 2008 Prius |
| 28 | Evans, John | 2000 Tundra |
| 29 | Everitt, Deborah | 2005 Prius |

| No. | Objector | Model/ Year |
|---|---|---|
| 30 | Ezenwa, Austin | 2006 4Runner |
| 31 | Gelber, David | 2006 Prius |
| 32 | Gerwer, Alex | 2005 Prius |
| 33 | Gibson, Dennis<br>Cozby, Laura | 2006 Lexus GX<br>2010 Lexus RX<br>2007 Lexus RX |
| 34 | Gikas, Olga | 2007 Camry Hybrid |
| 35 | Goodrow, Rita | 2010 Prius |
| 36 | Green Taxi | 2006 Prius |
| 37 | Howard, Nantawan | 2009 Lexus IS250C |
| 38 | Jackson, Donald & Debra | 2004 Camry Solara<br>2007 Camry Solara |
| 39 | Joseph, Joy Karotukunl | 2009 Camry |
| 40 | Juan, Victorino | 2010 Camry |
| 41 | Ledbetter, Kennon & Kim<br>Trinity, AL | Not<br>identified |
| 42 | Lombardi, Anthony | Un-named Lexus |
| 43 | Lowe, Janette R. | 2010 Yaris |
| 44 | Mehdiratta, Sharda | Lexus ES-300 |
| 45 | Murray, Donna | 2005 Camry |
| 46 | Neumann, Erich | 2008 FJ Cruiser |
| 47 | Parnell, Carolyn | 2002 Camry |
| 48 | Carpenter, David<br>Tyler, Vondell<br>Piazza, Jill<br>Piazza, Betty<br>Piazza, Stephen | 2002 Camry<br>2006 Avalon<br>2010 Lexus ES 350<br>2002 Lexus ES300<br>2003 Corolla<br>2010 Corolla<br>2002 Tundra |
| 49 | Pepski, Jeffrey | Lexus ES350 |
| 50 | Rodman, Scott | 2003 Lexus ES 300 |
| 51 | Rollins, David<br>Baton Rouge, LA | 2009 Prius and prior<br>2005 Prius |
| 52 | Saba, Robyn & Charles | 2008 Avalon |
| 53 | Senatore, Henry & Eileen | Unstated |
| 54 | Smith, Ruby | 2005 Avalon |
| 55 | Snyder, Roger<br>Weeks, Linton Stone | 2006 Prius<br>2007 Avalon<br>2007 Prius<br>2010 Prius |
| 56 | Thomas, Ann | 2002 Lexus LS |
| 57 | Trump, Stephen | 2008 Tacoma |
| 58 | Walter, Andrew | 2009 RAV4 |
| 59 | Waltman, Lora Louise | 2009 RAV4 |
| 60 | Wenzel, Donald & Mary Ann | 2005 Camry |
| 61 | Williams, Pamela | Lexus ES350 |
| 62 | Nelson, Isaiah | 2008 Camry |
| 63 | Tuzzo, Michael | 2006 Avalon |

| No. | Objector | Model/Year |
|---|---|---|
| 64 | Roberts, Eileen<br>Patel, Jagubhai<br>Collins, Candice | 2008 Solara<br>2006 Sienna<br>2005 Scion TC |
| 65 | Guerriero, Gary & Rebecca | 2008 Scion XB |
| 66 | Howell, Brenda<br>Morrison, Clarence | 2005 Camry<br>2005 Prius |
| 67 | Serafino, Victor | 2008 Lexus ES350 |
| 68 | Leonard, Lorraine | 2004 Camry |
| 69 | Richter, Susan | 2005 Camry |
| 70 | Pattaniak, Ladukesh | 2008 Lexus LS |
| 71 | Murrell, Sheila | 2005 Camry |
| 72 | Cirillo, Patricia | 2003 Camry |
| 73 | Gilland Roby, Erin | 2005 Prius |
| 74 | Ray, Chaitali | 2005 Corolla |
| 75 | Lin T. Ly<br>Margaret Strohlein | 2007 Scion<br>2005 Camry |
| 76 | Mingduan Lin | 2009 Corolla |
| 77<br>(Docket No. 3742) | Diane Krock | 2007 Camry |
| 3788 | Melinda and Kurt Wieland | 2005 Toyota Sienna |
| 3789 | Daniel J. Wood | 2004 Camry |
| 3790 | William McCarter | 2009 Scion TC |

## ATTACHMENT B: SETTLEMENT VALUATION

| Settlement Component | Amount | Source |
|---|---|---|
| Qualified Settlement Fund - Alleged Diminished Value Fund | $250,000,000 | Settlement Agreement § II(A)(2). |
| Qualified Settlement Fund - Cash Payment in Lieu of BOS Fund | $250,000,000 | Settlement Agreement § II(A)(4). |
| Estimated Value of BOS Installation on Eligible Subject Vehicles | $399,334,685 | Bonne Decl. ¶ 10 ($111.50 per vehicle); Motion at 29 (3,581,477 vehicles); Pltfs.' Reply at 24 & n.61 (3,581,477 x $111.50 = $399,334,685). |
| Estimated Value of Customer Support Program | $477,541,000 | Kleckner Decl. ¶ 11 & Ex. C. |
| | | |
| Total Settlement Value to be Distributed Directly to the Class | $1,376,875,685 | |
| | | |
| Automobile Safety and Education Fund | $30,000,000 | Settlement Agreement § II(A)(6) |
| | | |
| Total Settlement Value Before Attorney Fees, Out of Pocket Expenses ("Costs"), and Compensation to Named Plaintiffs | $1,406,875,685 | |
| | | |
| Attorney Fees | $200,000,000 | Settlement Agreement § VII(A) |
| | | |
| Costs | $27,000,000 | Settlement Agreement § VII(A) |
| | | |
| Compensation to Named Plaintiffs | $395,270 | Settlement Agreement § VII(E) (setting rate); see concurrently filed Order Regarding Motion for Attorneys' Fees, Reimbursement of Expenses, and Compensation to Named Plaintiffs for calculation. |
| | | |
| Total Settlement Valuation | $1,634,270,956 | |

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

**ATTACHMENT 2**

**Attorney Fee Order (MDL Docket No. 3802)**

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

Case No. 8:10ML 02151 JVS (FMOx)

IN RE: Toyota Motor Corp.
Unintended Acceleration Marketing,
Sales Practices, and Products Liability
Litigation

Order Regarding Motion for
Attorneys' Fees, Reimbursement of
Expenses, and Compensation to
Named Plaintiffs

This document relates to:

All Economic Loss Cases.

Table of Contents

I.  Background . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

II. Attorney Fees . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
    A.  Legal Standard . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

    B.  Discussion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

        1.  Results Achieved . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

        2.  Risks and Complexity of Litigation . . . . . . . . . . . . . . . . . . . . . 10

        3.  Skill of Counsel . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

        4.  Contingent Nature of the Fee . . . . . . . . . . . . . . . . . . . . . . . . . 12

        5.  Awards in Similar Cases . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

        6.  Reaction of the Class . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

        7.  Lodestar Cross-Check . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

    C.  Objections . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

    D.  Allocation of Fee Award . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

    E.  Conclusion as to Attorney Fees . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

III. Reimbursement Costs . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21
    A.  Legal Standard . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

    B.  Discussion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

    C.  Conclusion as to Reimbursement Costs . . . . . . . . . . . . . . . . . . . . . 23

IV. Compensation to Named Plaintiffs and Class Representatives . . . . . . . . . 24
    A.  Legal Standard . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

    B.  Discussion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

    C.  Conclusion as to Compensation to Named Plaintiffs and Class
        Representatives . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

V.      Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

Presently before the Court is a Motion filed by the Economic Loss Plaintiffs ("Plaintiffs") seeking an award of attorney fees, reimbursement of expenses, and compensation to named plaintiffs and class representatives. (Docket No. 3563.) A number of objections to the proposed award of fees, costs, and compensation have been filed.[1] Plaintiffs have filed a Reply brief in support of the Motion. (Docket No. 3732.) Pursuant to the Settlement Agreement, Toyota[2] does not oppose the Motion.

As set forth more fully below, the Court tentatively finds that the proposed award of fees, costs, and compensation is fair, reasonable, and adequate. However, the Court cannot complete its analysis before granting final approval of the proposed settlement agreement. Accordingly, and with the following discussion, the Court holds in abeyance the Motion for an Award of Attorneys' Fees, Reimbursement of Expenses, and Compensation to Named Plaintiffs.

---

[1]  The objections pertaining to the proposed award of fees, costs, and compensation are discussed *infra*. At the fairness hearing on June 14, 2013, none of the objectors who appeared addressed the Motion for an Award of Attorneys' Fees, Reimbursement of Expenses, and Compensation to Named Plaintiffs.

[2]  The Settlement Agreement defines "Toyota" as "Toyota Motor Corporation and Toyota Motor Sales, U.S.A., Inc." (Settlement Agreement § I(47).) Throughout this Order, the Court uses the term as it is defined by the parties.

I. __Background__

On December 28, 2012, on application from the Economic Loss Plaintiffs, this Court granted preliminary approval to a proposed settlement agreement.[3]  (See Docket Nos. 3344-45.)  After preliminary approval, the parties amended two terms of the proposed settlement agreement relating to the circumstances under which the funds might flow into each other.  (Docket No. 3424.)  Moreover, in their Reply, based on new information regarding the claim filing rates, Plaintiffs outlined changes to the plan of how to allocate the two cash settlement funds.  On the morning of the fairness hearing, the parties presented a further refinement on the allocation issue.  The terms of the settlement agreement, as amended, are summarized in a separate Tentative Order Regarding Proposed Class Action Settlement.

Under the Settlement Agreement,[4] Toyota has agreed to pay to Plaintiffs' class counsel ("class counsel"), separately from the settlement funds, "an award of Attorneys' Fees and Expenses in the Actions in the amount of $200 million in fees, plus up to an additional $27 million in expenses incurred prior to the Fairness

---

[3]  The proposed settlement agreement was reached with the assistance of Court-appointed Settlement Special Master Patrick A. Juneau.  (See Docket No. 2462.)

[4]  The Settlement Agreement is attached as an unenumerated Exhibit to Plaintiffs' Ex Parte Application for preliminary approval of the settlement.  (See Docket No. 3342-1 at 1-56.)  The Settlement Agreement is also available at the settlement website, www.toyotaelsettlement.com.

1    Hearing in the Actions." (Settlement Agreement § VII(A).)[5]  Class counsel may

2    also "petition the Court for incentive awards of up to $100.00 per hour per Plaintiff

3    and per Class Representative for their time in connection with the Actions, with a

4    $2,000 minimum award," which Toyota has agreed to pay.  (Id. § VII(E).)  In this

5    Order, the Court addresses only whether the proposed award of fees, costs, and

6    compensation is fair, reasonable, and adequate.

7

8    II.    Attorney Fees

9

10           A.    Legal Standard

11

12          A lawyer who recovers "a common fund for the benefit of persons other than

13   himself or his client" is entitled to reasonable attorney fees from the fund as a

14   whole.  Boeing Co. v. Van Gemert, 444 U.S. 472, 478 (1980); Staton v. Boeing

15   Co., 327 F.3d 938, 967 (9th Cir. 2003).  The Supreme Court has explained the

16   rationale underlying the "common fund doctrine" as follows:

17

18           [P]ersons who obtain the benefit of a lawsuit without contributing to its

19           cost are unjustly enriched at the successful litigant's expense.

20           Jurisdiction over the fund involved in the litigation allows a court to

21           prevent this inequity by assessing attorney's fees against the entire fund,

22   _____

23          [5]  Under the Settlement Agreement, if the Court awards an amount less than
     $227 million in fees and costs, Toyota would pay the remainder to the Automobile
24   Safety and Education Program Fund. (Settlement Agreement § VII(B).)  However,
     for the reasons discussed herein, the Court is inclined to award the entire proposed
25   amount.

1  thus spreading fees proportionately among those benefited by the suit.

2

3  Van Gemert, 444 U.S. at 478 (citation omitted).  Accordingly, "in common fund

4  cases, a variant of the usual rule applies and the winning party pays his or her own

5  attorneys' fees."  Staton, 327 F.3d at 967.

6

7  In a common fund case, the court has discretion to use either a percentage or

8  lodestar method to determine attorney fees.[6]  Hanlon v. Chrysler Corp., 150 F.3d

9  1011, 1029 (9th Cir. 1998).  The percentage method requires the court simply to

10  determine what percentage of the fund would provide class counsel with a

11  reasonable fee under all the circumstances.  Id.  The Ninth Circuit "has established

12  25% of the common fund as a benchmark award for attorney fees."  Id.  However,

13  "[t]he benchmark percentage should be adjusted, or replaced with a lodestar

14  calculation, when special circumstances indicate that the percentage recovery

15  would be either too small or too large in light of the hours devoted to the case or

16  other relevant factors."  Six (6) Mexican Workers v. Ariz. Citrus Growers, 904

17  F.2d 1301, 1311 (9th Cir. 1990); Vizcaino v. Microsoft Corp., 290 F.3d 1043,

18  1048 (9th Cir. 2002) ("The 25% benchmark rate, although a starting point for

19  analysis, may be inappropriate in some cases.").  A "mechanical or formulaic

20  application" of the percentage method is inappropriate "where it yields an

21  unreasonable result."  In re Coordinated Pretrial Proceedings in Petroleum Prods.

22  _____

23  [6] "Despite this discretion, use of the percentage method in common fund
   cases appears to be dominant."  In re Omnivision Techs., Inc., 559 F. Supp. 2d

24  1036, 1046 (N.D. Cal. 2007); see also In re Activision Sec. Litig., 723 F. Supp.
   1373, 1378-79 (N.D. Cal. 1989) (discussing advantages of percentage method).

25

Antitrust Litig., 109 F.3d 602, 607 (9th Cir. 1997) [hereinafter Petroleum Prods.];

In re Critical Path, Inc., Sec. Litig., No. C 01-00551 WHA, 2002 U.S. Dist. LEXIS

26399, at *24 (N.D. Cal. June 18, 2002).  Regardless of which method the court

uses, it must "explain[] its determination by written order or in open court."

Powers v. Eichen, 229 F.3d 1249, 1256 (9th Cir. 2000).

The Ninth Circuit encourages courts to use the lodestar method as a "cross-

check" on the reasonableness of a fee award determined with the percentage

method.  See Vizcaino, 290 F.3d at 1050; Petroleum Prods., 109 F.3d at 607 ("It is

reasonable for the district court to compare the lodestar fee, or sum of lodestar fees,

to the 25% benchmark, as one measure of the reasonableness of the attorneys'

hours and rates."); Kakani v. Oracle Corp., No. C 06-06493 WHA, 2007 U.S. Dist.

LEXIS 95496, at *6 (N.D. Cal. Dec. 21, 2007).  Indeed, this Court directed class

counsel to "submit a lodestar calculation for purposes of comparison and

validation."  (Docket No. 3344 at 23.)

To calculate the "lodestar," the court must multiply the number of hours the

attorneys reasonably spent on the litigation by the reasonable hourly rate in the

community for similar work.  McElwaine v. U.S. West, Inc., 176 F.3d 1167, 1173

(9th Cir. 1999).  The court may raise or lower the lodestar based on several factors:

(1) the time and labor required; (2) the novelty and difficulty of the

questions involved; (3) the skill requisite to perform the legal service

properly; (4) the preclusion of other employment by the attorney due to

acceptance of the case; (5) the customary fee; (6) whether the fee is fixed

or contingent; (7) time limitations imposed by the client or the circumstances; (8) the amount involved and the results obtained; (9) the experience, reputation, and ability of the attorneys; (10) the "undesirability" of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases.

Fischel v. Equitable Life Assurance Soc'y, 307 F.3d 997, 1007 n.7 (9th Cir. 2002). The court must be cautious, however, not to adjust the lodestar figure based on any of the foregoing factors that are subsumed in the original lodestar calculation. Morales v. City of San Rafael, 96 F.3d 359, 364 & n.9 (9th Cir. 1996). The Ninth Circuit has noted that multipliers range from 1.0-4.0 and a "bare majority" fall within the range of 1.5-3.0. Vizcaino, 290 F.3d at 1051 n.6; Van Vranken v. Atl. Richfield Co., 901 F. Supp. 294, 298 (N.D. Cal. 1995) ("Multipliers in the 3-4 range are common in lodestar awards for lengthy and complex class action litigation.").

B.    Discussion

Class counsel requests that the Court approve an award of attorney fees in the amount of $200 million. (Motion at 1.) According to Plaintiffs' experts, the total value of the Settlement Agreement exceeds $1.6 billion.[7] Therefore, the

_____

[7] In determining the total settlement value, Plaintiffs' experts appropriately have included the non-monetary benefits – Brake Override System ("BOS") installations  and operation of the Customer Support Program ("CSP") – which can

requested fee award represents approximately 12.3 percent of the total settlement value.

Although 12.3 percent of the common fund falls well below the 25 percent benchmark, the Court must nonetheless consider whether this percentage should be adjusted based on all the circumstances.  <u>See</u> <u>Six (6) Mexican Workers</u>, 904 F.2d at 1311; <u>Vizcaino</u>, 290 F.3d at 1048.  The Court will first consider several factors approved by the Ninth Circuit for determining the reasonableness of a proposed fee award.  <u>See</u> <u>Vizcaino</u>, 290 F.3d at 1048-50.  After that, the Court will use the lodestar method as a "cross-check" on the reasonableness of the award.  <u>See</u> <u>id.</u> at 1050.

_____

reasonably be valued.  <u>See</u> <u>Staton</u>, 327 F.3d at 973-74; <u>Hanlon</u>, 150 F.3d at 1029. Michael Bonne values the BOS installations, based on the average retail cost for such an installation, at approximately \$400 million.  (<u>See</u> Bonne Declaration (Docket No. 3557) ¶ 10.)  Kirk Kleckner values operation of the CSP at approximately \$477 million.  (Kleckner Decl. (Docket No. 3358) ¶ 11 & Ex. C.) Valuation of the CSP was derived based on the market price of similar extended service contracts offered in the industry.  (<u>Id.</u> at ¶¶ 8-10, Ex. C)  Finally, the \$1.6 billion valuation includes \$227 million in attorney fees and litigation costs, compensation to named plaintiffs and class representatives, and the costs of notice and administration.  <u>See</u> <u>Staton</u>, 327 F.3d at 974; <u>Johnston v. Comerica Mortg. Corp.</u>, 83 F.3d 241, 246 (8th Cir. 1996) (construing attorney fees as "an aspect of the class' recovery").

1.    <u>Results Achieved</u>

"Courts have consistently recognized that the result achieved is a major factor to be considered in making a fee award." <u>In re Heritage Bond Litig.</u>, No. 02-ML-1475-DT(RCx), 2005 U.S. Dist. LEXIS 13627, at *27 (C.D. Cal. June 10, 2005) (citing <u>Hensley v. Eckerhart</u>, 461 U.S. 424, 436 (1983)); <u>Vizcaino</u>, 290 F.3d at 1048 ("Exceptional results are a relevant circumstance.").

Here, the total value of the Settlement Agreement exceeds $1.6 billion, making this one of the largest automobile class action settlements – if not the largest – in history.[8]  Plaintiffs' expert estimates total economic losses caused by the alleged diminished value to be $590 million.  (Manuel Decl. (Docket No. 3560) ¶ 35.)  Based on this estimate, the $250 million Alleged Diminished Value Fund recovery constitutes approximately 42 percent of total economic losses.[9] (Fitzpatrick Decl. (Docket No. 3564) ¶ 16.)  The $250 million contribution to the Cash-in-Lieu-of-BOS Fund represents approximately 25 percent of the aggregate, class-wide estimated average cost of a BOS installation, based on 9,020,154 eligible vehicles.[10]  (<u>See</u> Sherwood Decl. (Docket No. 3559) ¶ 9.)  And class

---

[8]  At oral argument class counsel represented this settlement to be the largest automobile class action settlement.

[9]  This percentage-of-damages recovery is exceptional.  <u>See, e.g.</u>, <u>In re Cendant Corp. Litig.</u>, 264 F.3d 201, 241 & n.22 (3d Cir. 2001) (citing securities settlements between 1.6 and 14 percent of damages).

[10]  Subtracting 6,309,384 BOS-eligible vehicles and 1,325,314 hybrid vehicles from the 16,654,852 universe of current registrations yields 9,020,154 vehicles.  9,020,154 eligible vehicles multiplied by the $111.50 average BOS

members who submit eligible claims against the Cash-in-Lieu-of-BOS Fund may

recover 100 percent of the estimated value of a BOS, depending on the jurisdiction

in which they reside and the volume of claims.[11]  Considering only these monetary

benefits, class counsel have achieved exceptional results for the class.


       The non-monetary benefits for the class are also extremely valuable.  Over

3.5 million class members who currently own or lease a qualifying vehicle will be

eligible to receive BOS.  In monetary terms, this benefit is valued at approximately

$400 million.  (Bonne Decl. ¶ 10.)  Furthermore, the Customer Support Program

will provide prospective coverage for repairs and adjustments needed to correct

defects in materials or workmanship in five components related to the acceleration

system.  Over 16.1 million class members may benefit from the Customer Support

Program, which is valued at approximately $477 million.  (Kleckner Decl. ¶¶ 8-11

& Ex. C.)


       As discussed in the following subsection, class counsel obtained these

benefits for the class while facing tremendous risks.  By any measure, the results

achieved by class counsel are exceptional.  This factor weighs strongly in favor of

approving the entire proposed fee award.

---

installation cost yields $1,005,747,171.  The $250 million fund is approximately 25
percent of this number.  (Motion at 9 n.37.)

   [11]  Toyota's $30 million contribution to the Automobile Safety and
Education Research Fund also will benefit class members, as discussed in the
Tentative Order Regarding Proposed Class Action Settlement.

## 2.    Risks and Complexity of Litigation

Another significant factor to be considered in determining attorney fees is the risk that counsel took of "not recovering at all, particularly [in] a case involving complicated legal issues."  In re Omnivision Techs., 559 F. Supp. 2d at 1046-47; Vizcaino, 290 F.3d at 1048; In re Heritage Bond, 2005 U.S. Dist. LEXIS 13627, at *44 ("The risks assumed by Class Counsel, particularly the risk of non-payment or reimbursement of costs, is a factor in determining counsel's proper fee award.").

There is no question that this litigation is complex.  With respect to risks, the Court first notes that neither NASA nor NHTSA were able to identify a defect in the electronic throttle control system in the vehicles they tested.  Accordingly, throughout the litigation, Toyota – represented by exceptionally skilled counsel – has argued that no defect exists.  On this basis alone, class counsel faced an extremely difficult path.  Nevertheless, they continued to pursue relief for the class, surviving a series of dispositive motions and eventually agreeing to settle for over $1.6 billion.

Class counsel faced several other major risks in this litigation.  Two interlocutory appeals are pending.  The first challenges this Court's holding that Plaintiffs have Article III standing to assert their claims notwithstanding not having experienced an actual alleged incident of SUA.  (See Docket No. 1623.)  The second challenges the Court's order denying Toyota's Motion to Compel Arbitration.  (Docket No. 2312.)  A ruling in favor of Toyota on either issue  would drastically alter the present case by extinguishing the claims of a majority of class

members.  Moreover, this Court ruled on the legal issue of whether it could order

injunctive relief in the form of repairs or adjustments to the Subject Vehicles, or

whether NHSTA's finding of the lack of defect could be held to preclude such an

order.  (Docket No. 510 at 88-98.)  A higher court could disagree with the Court's

ruling.

Furthermore, the Settlement Agreement was reached before the Court ruled

on a number of motions to exclude Plaintiffs' expert testimony.  The uncertainty as

to the admissibility of Plaintiffs' expert reports, on which their claims heavily rely,

greatly contributes to the risks.  Finally, if this litigation were to proceed all the

way to trial, the outcome would be uncertain and a lengthy appeal period likely

would follow.

The Court has not detailed all of the risks faced by class counsel throughout

this litigation.  It is clear, however, based only on the risks discussed herein, that

this factor strongly supports the proposed fee award.

3.    Skill of Counsel

Courts have recognized that the "prosecution and management of a complex

national class action requires unique legal skills and abilities."  Knight v. Red Door

Salons, Inc., No. 08-01520 SC, 2009 U.S. Dist. LEXIS 11149, at *16 (N.D. Cal.

Feb. 2, 2009) (quoting Edmonds v. United States, 658 F. Supp. 1126, 1137 (D.S.C.

1987)).  "The single clearest factor reflecting the quality of class counsels' services

to the class are the results obtained."  In re Heritage Bond, 2005 U.S. Dist. LEXIS

1   13627, at *39-40 (quoting <u>Cullen v. Whitman Med. Corp.</u>, 197 F.R.D. 136, 149

2   (E.D. Pa. 2000)).

3

4       Throughout this litigation, class counsel consistently has demonstrated

5   extraordinary skill and effort.  As discussed above, they faced numerous

6   challenges.  Class counsel also led a massive discovery effort, which was necessary

7   to investigate and support their factually complex claims.  The subject matter –

8   defects in Toyota's electronic throttle control system for a myriad of vehicles over

9   more than ten years – is daunting and has required particular expertise.

10  Furthermore, this case involved difficult questions of law – state and federal,

11  procedural and substantive.  Finally, class counsel faced an exceptionally skilled

12  adversary with substantial resources.  <u>See</u> <u>In re Equity Funding Corp. Sec. Litig.</u>,

13  438 F. Supp. 1303, 1337 (C.D. Cal. 1977).  Accordingly, this factor weighs in

14  favor of approving the entire proposed fee award.

15

16      4.    <u>Contingent Nature of the Fee</u>

17

18      Attorneys are entitled to a larger fee award when their compensation is

19  contingent in nature.  <u>See</u> <u>Vizcaino</u>, 290 F.3d at 1048-50; <u>see also</u> <u>In re Omnivision</u>

20  <u>Techs.</u>, 559 F. Supp. 2d at 1047.  "It is an established practice in the private legal

21  market to reward attorneys for taking the risk of non-payment by paying them a

22  premium over their normal hourly rates for contingency cases."  <u>In re Wash. Pub.</u>

23  <u>Power Supply Sys. Sec. Litig.</u>, 19 F.3d 1291, 1299 (9th Cir. 1994).  This ensures

24  competent representation for plaintiffs who may not otherwise be able to afford it.

25  <u>Id.</u>

12

1

2      Here, class counsel have expended at least 165,930 hours and spent over $27

3 million in litigation costs, all at the risk of receiving no compensation

4 whatsoever.[12]  During the past three and a half years, class counsel dedicated an

5 exorbitant amount of time, energy, and resources to discovery, motion practice,

6 and other matters in this litigation.  The work performed by class counsel is

7 summarized thoroughly in the Declaration of Steve Berman (Docket No. 3565) at

8 pages 1 through 38.  Because of the demands of this litigation, class counsel have

9 forgone the business opportunity to devote time to other cases.  See Vizcaino, 290

10 F.3d at 1050.  This factor supports the proposed fee award.

11

12      5.   Awards in Similar Cases

13

14      As noted above, the Ninth Circuit has established 25 percent of the common

15 fund as the benchmark for attorney fee awards.  Plaintiffs' expert has conducted an

16 empirical study and found that, in 2006 and 2007, the most common fee

17 percentages awarded by all federal courts were 25 percent, 30 percent, and 33

18 percent.  Nearly two-thirds of the awards were between 25 percent and 35 percent.

19 In the Ninth Circuit particularly, the most common percentages awarded were 25

20 percent, 30 percent, and 33 percent.  (Fitzpatrick Decl. ¶ 20.)  Furthermore, class

21 counsel cites several cases in which the total settlement values were extraordinarily

22 _____

23    [12]  According to Steve Berman, class counsel have invested more than
$69,706,936 in lodestar and $30,606,117 in litigation costs.  (Berman Decl.
24 (Docket No. 3565) ¶ 135.)  In a survey of 688 class action settlements by
Plaintiffs' expert, in only one case did the class counsel advance more costs than
25 class counsel have advanced here.  (Fitzpatrick Decl. ¶ 17.)

large and the fee awards were above 25 percent of the common fund.  E.g., In re
TFT-LCD (Flat Panel) Antitrust Litig., MDL No. 1827, 2013 WL 1365900 (N.D.
Cal. Apr. 3, 2013) (awarding 28.5 percent of $27.5 million settlement fund);
Allapattah Servs., Inc. v. Exxon Corp., 454 F. Supp. 2d 1185 (S.D. Fla. 2006)
(awarding 31.3 percent of $1.075 billion settlement fund); In re Vitamins Antitrust
Litig., MDL No. 1285, 2001 WL 34312839 (D.D.C. July 16, 2001) (awarding 34
percent of $365 million settlement fund).  Therefore, the Court finds that fee
awards in cases involving similar settlement values further support the proposed
fee award.

### 6.    Reaction of the Class

The Court may also consider the reaction of the class to the proposed fee
award.  In re Omnivision Techs., 559 F. Supp. 2d at 1048; In re Heritage Bond,
2005 U.S. Dist. LEXIS 13627, at *48 ("The presence or absence of objections
from the class is also a factor in determining the proper fee award.").  Here, over
22.6 million short form notices were mailed to class members and only 77
objections to the Settlement Agreement were filed.  Of these 77 objections, only 20
relate to the proposed fee award.  The Court addresses the substance of the
objections below.  This generally favorable reaction of the class weighs in favor of
approving the proposed fee award.

7.     Lodestar Cross-Check

"Calculation of the lodestar, which measures the lawyers' investment of time in the litigation, provides a check on the reasonableness of the percentage award." Vizcaino, 290 F.3d at 1050-51; In re Omnivision Techs., 559 F. Supp. 2d at 1048. As noted above, the Ninth Circuit encourages courts to cross-check the reasonableness of a fee award determined using the percentage method with the lodestar method.

Here, a cross-check using the lodestar method confirms the reasonableness of the proposed fee award.  According to the Declaration of Steve Berman, class counsel's lodestar is $69,706,936[13] and their litigation costs are $30,606,117, for a total investment of $100,313,053.  (Berman Decl. ¶ 135.)  Dividing the lodestar into the $200 million proposed fee award yields a multiplier of 2.87.  This is within the range approved by courts within this Circuit.  Considering all the circumstances, and particularly the tremendous risks undertaken by class counsel, the Court finds that this multiplier is warranted.  Thus, the lodestar method confirms the reasonableness of the proposed fee award.

---

[13]  Class counsel have expended at least 165,930 hours in this case.  (See generally Berman Decl.; Motion at 2, Appendix A (Summary of Firms Lodestar and Costs).)  The hourly rates of class counsel range from $150 to $950.  Class counsel's experience, reputation, and skill, as well as the complexity of this case, justify these hourly rates.  See Prison Legal News v. Schwarzenegger, 608 F.3d 446, 455 (9th Cir. 2010).

C.    Objections

As noted above, only 20 of the 77 objections filed relate to the proposed fee award.[14]  A detailed chart of the objections reviewed and considered by the Court is attached to the Tentative Order Regarding Proposed Class Action Settlement as Attachment A.  The Court generally addresses the substance of the objections, without addressing each objection individually.[15]

All objectors to the proposed fee award contend that it is excessive.  As a preliminary matter, the Court notes that none of the objectors have provided an expert declaration or any other evidence undermining the Court's conclusions herein.  Some objectors arbitrarily propose an alternative percentage of the common fund that should be used to determine the fee award.  (Objection Nos. 9, 15, 48, 66, 67.)  The Court has considered all the circumstances of the case and performed a lodestar cross-check, and concluded that the proposed fee award, which represents only 12.3 percent of the total settlement value, is fair, reasonable, and adequate.  These unsupported objections do not convince the Court otherwise.

Some objectors contend that as a "mega-fund," the percentage awarded to class counsel should be significantly lower than the 25 percent benchmark.  (E.g.,

_____

[14]  Objection Nos. 5, 9, 15, 18, 19, 21, 22, 26, 36, 37, 46, 48, 53, 58, 64, 65, 66, 67, 73, 75.  (See Tentative Order Regarding Proposed Class Action Settlement, Attachment A.)

[15]  The Court cites objections herein using the numbers assigned to them in Attachment A to the Tentative Order Regarding Proposed Class Action Settlement.

1  Objection Nos. 5, 18, 64, 67.)  First, the Court notes that the proposed fee award <u>is</u>

2  significantly lower than the benchmark.  Regardless, there is no rule in the Ninth

3  Circuit that requires a court to decrease the percentage of a fee award as the size of

4  the settlement increases.  <u>Vizcaino</u>, 290 F.3d at 1047 (rejecting the so-called

5  "increase-decrease rule").  Instead, the Court must consider the size of the fund as

6  "one relevant factor" in determining whether to adjust the percentage.  <u>Id.</u>; <u>see also</u>

7  <u>In re Wash. Pub. Power</u>, 19 F.3d at 1297 (requiring the court to consider the size of

8  the fund).  Here, the Court has considered the size of the fund and found that 12.3

9  percent of the total settlement value is a fair and reasonable fee award, particularly

10  in light of the risks and complexity of this litigation.[16]  Accordingly, these

11  objections lack merit.

12

13      Other objectors contend that the non-cash aspects of the Settlement

14  Agreement should not be considered in determining its total value.  (Objection

15  Nos. 5, 21, 46, 65, 66, 67.)  Because the non-cash benefits can reasonably be

16  valued, as indicated by Plaintiffs' experts and discussed in footnote 7, *supra*, they

17  should be considered.  <u>Staton</u>, 327 F.3d at 973-74; <u>Hanlon</u>, 150 F.3d at 1029.  BOS

18  installations and the CSP have value.  BOS is a safety innovation that will

19  automatically reduce engine power when the brake pedal and accelerator pedal are

20  applied simultaneously under certain driving conditions.  CSP is essentially an

21  extended service contract, under which owners of Subject Vehicles will benefit

22  from extended coverage of certain components at issue in this litigation.

23

24      [16]  The Court also agrees with Plaintiffs' expert (Fitzpatrick Decl. ¶ 23), and
other courts, <u>e.g.</u>, <u>Allapattah Servs.</u>, 454 F. Supp. 2d at 1213, which have found

25  that decreasing a fee percentage based only on the size of the fund would provide a
perverse disincentive to counsel to maximize recovery for the class.

Accordingly, these objections lack merit.

A couple of objectors contend that the lodestar multiplier is too high. (Objection Nos. 5, 67.)  But as discussed above, considering all the circumstances of this litigation, particularly the risks, the multiplier – which falls within the range accepted by the Ninth Circuit – is appropriate.  See Vizcaino, 290 F.3d at 1051-52 (providing table of commonly used multipliers).  Other objectors request that the Court appoint an auditor or Special Master to audit the lodestar, or even request access to class counsel's billing records.  (Objection No. 9, 15, 18.)  The lodestar is supported by the Declaration of Steve Berman, lead co-counsel, and the Court has no reason to doubt its accuracy.  Furthermore, the lodestar is used here only as a cross-check on the percentage method.  In a case such as this, where class counsel have expended at least 165,930 hours, the Court may rely on summaries and declarations in lieu of detailed records.  E.g., In re Prudential Ins. Co. of Am. Sales Practices Litig. Agent Actions, 148 F.3d 283, 332 n.107 (3d Cir. 1998).  Accordingly, these objections lack merit.

Some objectors challenge the proposed contributions to the Automobile Safety Research and Education Fund.  (Objection Nos. 36, 64.)  Because the Court discusses this fund and objections to it in the Tentative Order Regarding Proposed Class Action Settlement, the Court does not discuss these objections here.

One objector contends that no attorney fees should be awarded because of collusion in agreeing to the proposed fee award.  (Objection No. 65.)  First, the Settlement Agreement, including the agreement as to fees and costs, was reached

after many months of arm's-length negotiations supervised by the Court-appointed Settlement Special Master, Patrick Juneau.  Second, as discussed above, the results of the settlement are excellent for the class.  Third, class counsel represents to the Court that the parties reached their agreement as to attorney fees and costs separately from the rest of the Settlement Agreement and subject to Court approval.  (See Berman Decl. ¶¶ 78-87.)  There is no evidence of collusion and, therefore, this objection lacks merit.

Finally, a few objectors contend that the notice did not adequately disclose the specific amount of attorney fees and costs that class counsel would request.  (Objection Nos. 15, 46.)  This is not true.  The notice stated: "Class Counsel will ask the Court for attorney fees not to exceed $200 million, plus up to an additional $27 million in costs and expenses."  It further stated:  "Class Counsel will ask for payments to each of the Plaintiffs and Class Representatives of $100 per hour, with a minimum of $2,000 award, for their time invested in connection with the Actions."  (Short Form Notice ¶ 14.)

To the extent the Court has not specifically addressed any of the objections that were filed, they lack merit.  The Court has reviewed and considered all of the objections.

Case 8:10-ml-02151-JVS-FMO   Document 3063   Filed 06/17/13   Page 95 of 105   Page ID #:124766

D.    Allocation of Fee Award

The Court may grant a lump sum award to be divided among class counsel as they deem appropriate.  The Court need not "specify what share of the common fund award that each attorney [will] receive." Six (6) Mexican Workers, 904 F.2d at 1311; Hartless v. Clorox Co., 273 F.R.D. 630, 646 (S.D. Cal. 2011) ("[F]ederal courts routinely affirm the appropriateness of a single fee award to be allocated among counsel and have recognized that lead counsel are better suited than a trial court to decide the relative contributions of each firm and attorney."). But see In re Critical Path, 2002 U.S. Dist. LEXIS 26399, at *25 ("The Court believes that the better practice, for future cases, is to disclose the exact allocation proposed between the firms.").

If awarded, the attorney fees will be paid, collectively, to the 31 Plaintiffs' firms that worked on the litigation.  Class counsel propose that they allocate the fees among the eligible Plaintiffs' counsel in a manner that they believe, in good faith, reflects the contributions of counsel to the prosecution and settlement of the claims against Toyota.  The Court tentatively approves this plan, as class counsel are the most familiar with the amount of work actually contributed by each of the 31 firms.

E.     Conclusion as to Attorney Fees

For the foregoing reasons, the Court tentatively finds that the proposed award of fees, costs, and compensation is fair, reasonable, and adequate. However, the Court cannot complete its analysis before final approval of the Settlement Agreement is granted.

III.   Reimbursement Costs

Class counsel requests an award of $27 million in litigation costs, a discount from the $30,606,117 in total costs incurred thus far.[17]  (Motion at 26.)

A.     Legal Standard

An attorney who has created a common fund for the benefit of the class is entitled to reimbursement of reasonable litigation costs from that fund. See, e.g., In re Omnivision Techs., 559 F. Supp. 2d at 1048 (citing Harris v. Marhoefer, 24 F.3d 16, 19 (9th Cir. 1994)).  The award "should be limited to typical out-of-pocket expenses that are charged to a fee paying client and should be reasonable and necessary." In re Immune Response Sec. Litig., 497 F. Supp. 2d 1166, 1177 (S.D. Cal. 2007) (citing In re Media Vision Tech. Sec. Litig., 913 F. Supp. 1362,

---

[17]  Litigation costs are detailed in (1) the Declaration of Steve Berman ¶¶ 129-35, and accompanying exhibits; (2) the Declaration of Marc Seltzer (Docket No. 3563-7) ¶¶ 34-36, and accompanying exhibits; (3) the Declarations of Plaintiffs' Counsel accompanying Appendix A (Docket Nos. 3563-1 to 3563-7), and accompanying exhibits (collectively, the "Expense Reports").

1366 (N.D. Cal. 1996)).  "The taxation of costs lies within the trial court's

discretion."  In re Media Vision Tech., 913 F. Supp. at 1366 (citation omitted).


B.    Discussion


Specifically, class counsel seek reimbursement for Shared and Held Costs as

defined by the Court's Fee Order (Docket No. 483).  These include costs for, *inter

alia*, (1) fees paid to or incurred by experts; (2) computerized research and other

services; (3) court filing and service costs; (4) deposition and court reporter costs;

(5) costs associated with the document depository; (5) printing, copying, and

shipping costs; and (6) travel costs.  (See generally Expense Reports).  Pursuant to

the Settlement Agreement, Toyota does not object to this request.  (Settlement

Agreement § VII.)  The Court has received no specific objections to billed line-

items, although one objector requests that a Special Master review the costs.[18]

(E.g., Objection No. 9.)


The Court has reviewed the Expense Reports, whose detail belies any need

for the appointment of a Special Master.  The Court finds that the requested costs

were reasonable and necessary.  Courts may direct reimbursement for travel costs.

In re Immune Response, 497 F. Supp. 2d at 1177 (citation omitted).  Postage,

telephone, fax, and notice costs, and filing fees and photocopies, also are necessary

---

[18]  The Court finds that the class also was aware of the costs provision in the
Settlement Agreement.  The notice stated that class counsel will request "up to an
additional $27 million in costs and expenses," that Toyota will separately make
any such payment, and that any such payment "will not reduce the value of the
settlement benefits made available to Class Members."  (Short Form Notice ¶ 14.)

1    costs in complex class action litigation and are recoverable.  Id.  "[C]omputerized

2    legal research 'is an essential tool of a modern efficient law office,'" and the

3    complexity of this case justifies the costs of these services as well.  Id. (quoting

4    Robinson v. Ariyoshi, 703 F. Supp. 1412, 1436 (D. Haw. 1989)).  Mediation costs

5    and contributions to the litigation fund (assessment fees) also are reimbursable.

6    See id. (citing Lenahan v. Sears, Roebuck & Co., Civ. No. 02-0045, 2006 WL

7    2085282, at *22 (D.N.J. July 24, 2006) (approving mediation fees reimbursement

8    in common fund case); In re Media Vision Tech., 913 F. Supp. at 1372 (approving

9    assessment fee reimbursement).  In addition, given the complex factual nature of

10   this case and the extensive disputes over liability, the "expert testimony submitted

11   was 'crucial or indispensable' to the litigation at hand" and the ultimate settlement

12   between the parties and therefore should be reimbursed.  Id. at 1366 (quoting

13   United States v. City of Twin Falls, 806 F.2d 862, 864 (9th Cir. 1986)).

14

15          C.     Conclusion as to Reimbursement Costs

16

17          For the foregoing reasons, the Court tentatively finds that the proposed

18   award of costs is fair, reasonable, and adequate.  However, the Court cannot

19   complete its analysis before final approval of the Settlement Agreement is granted.

20

21

22

23

24

25

IV.     Compensation to Named Plaintiffs and Class Representatives

Plaintiffs and class counsel request that the Court approve the proposed incentive awards to named plaintiffs and class representatives, as provided for in § VII(E) of the Settlement Agreement and detailed in Appendix B (Docket No. 3563-8.)  Plaintiffs believe the awards are justified because of the work provided by these individuals, the burdens borne by them during the litigation, and their efforts on behalf of the class and the general public.  (Motion at 26-27.)  Pursuant to the Settlement Agreement, each individual is to be compensated at a rate of $100 per hour of work, with a minimum award of $2,000.  There are 87 separate proposed awards, totaling $395,270.[19]  (See Appendix B.)  Most compensation awards are for less than $5,000; only six are for $10,000 or more.  (Id.)

Toyota does not object to this request.  The Court has received no objections to any particular incentive award.  The objections more generally are: (1) the notice did not properly disclose the specific amount of each award; (2) the amount of the awards creates a conflict of interest between named plaintiffs and class representatives vis-à-vis the class; and (3) awards are excessive.  (E.g., Objection No. 46.)  As explained below, the Court finds that these objections lack merit and approves the requested awards.

---

[19]  Each named plaintiff and class representative has submitted a declaration substantiating his or her involvement.  (See Declarations of Class Representatives & Named Plaintiffs ("Incentive Award Declarations"), Docket Nos. 3563-9 to 3563-14.)

A.   <u>Legal Standard</u>

Incentive awards are "intended to compensate class representatives for work done on behalf of the class, to make up for financial or reputational risk undertaken in bringing the action, and, sometimes, to recognize their willingness to act as a private attorney general." <u>Rodriguez v. W. Publ'g Corp.</u>, 563 F.3d 948, 958-59 (9th Cir. 2009).  Such payments must be "scrutinize[d] carefully . . . so that they do not undermine the adequacy of the class representatives." <u>Radcliffe v. Experian Info. Solutions, Inc.</u>, — F.3d —, 2013 WL 1831760, at *3 (9th Cir. 2013) (citing <u>Staton</u>, 327 F.3d at 977); <u>Rodriguez</u>, 563 F.3d at 959 ("An absence of material conflicts of interest between the named plaintiffs and their counsel with other class members is central to adequacy and, in turn, to due process for absent members of the class." (citing <u>Hanlon</u>, 150 F.3d at 1020)).  In evaluating an incentive award, the court should consider "the actions the plaintiff has taken to protect the interests of the class, the degree to which the class has benefitted from those actions, . . . the amount of time and effort the plaintiff expended in pursuing the litigation . . . and reasonabl[e] fear[s of] workplace retaliation." <u>Staton</u>, 327 F.3d at 977 (quoting <u>Cook v. Niedert</u>, 142 F.3d 1004, 1016 (7th Cir. 1998)).

B.   <u>Discussion</u>

First, the notice clearly explained that "Class Counsel will ask for payments to each of the Plaintiffs and Class Representatives of $100 per hour, with a minimum of $2,000 award, for their time invested in connection with the Actions." (Short Form Notice ¶ 14.)  The Incentive Award Declarations were filed on April

23, 2013 (before the objection deadline), and detailed the specific amount
requested.  Thus, the class was not prejudiced by the lack of specific information in
the notice.


Second, there is no evidence or reason to infer that the awards – none of
which are excessive – created any conflict of interest between named plaintiffs and
class representatives vis-à-vis the class.  In Staton, a settlement would have
awarded 29 class representatives up to $50,000 each, with an average award of
$30,000 and a total award of $890,000.  327 F.3d at 976-77.  The award was not
limited to the amount of hours a class representative worked on the matter.  See id.
The Ninth Circuit concluded that the payments undermined the adequacy of the
settlement.  Id. at 977-78.  There was insufficient evidence that the class
representatives had the strongest claims and were not just people who retained
counsel before settlement, and many receiving incentive awards were not essential
to the litigation.  Id. at 977.  These issues and the fact that the awards were much
larger than the payments to individual class members "eliminate[d] a critical check
on the fairness of the settlement for the class as a whole" and created a danger that
the representatives were "more concerned with maximizing those incentives than
with judging the adequacy of the settlement as it applies to class members at
large."  Id.


In Rodriguez, 563 F.3d at 957, retainer agreements required class counsel to
request incentive awards that increased on a sliding scale as the class's monetary
recovery increased.  The court found that the agreements gave the named plaintiffs
no incentive to settle for less than the maximum contemplated relief, and no

1    incentive to go to trial even if trial was best for the class.  Id. at 959.

2

3         Most recently, in Radcliffe, the Ninth Circuit reversed a final approval

4    where the settlement explicitly conditioned the incentive awards on the

5    representatives' support for the settlement and the payments were in a fixed

6    amount ($5000) that significantly exceeded what absent class members could

7    expect to recover (from $26 to $750).  2013 WL 1831760, at *5.  These

8    shortcomings "fatally alter[ed] the calculus for the class representatives, pushing

9    them to be 'more concerned with maximizing [their own gain] than with judging

10   the adequacy of the settlement as it applies to class members at large.'"  Id.

11   (quoting Staton, 327 F.3d at 977).

12

13        The Court has reviewed each Incentive Award Declaration and finds that the

14   specific concerns in Staton, Rodriguez, and Radcliffe are not present here.  No one

15   disputes that the individuals effectively and honestly fulfilled their obligations and

16   contributed to the Settlement Agreement.  This litigation involved extensive risks,

17   and each individual spent a significant amount of time reviewing the complaint,

18   conferring with counsel, reviewing communications, responding to document

19   requests and interrogatories, attending depositions, and discussing the proposed

20   settlement, among other things.  (See generally Incentive Payment Declarations.)

21   Those seeking greater awards substantiate their greater involvement, such as

22   attending depositions or having their vehicles inspected.  (E.g., Incentive Award

23   Declaration of Dale Baldisseri, Appendix B, Ex. 2.)  The largest awards are sought

24   by an automotive sales dealership, a rental car business, and a residual value

25   insurer and lease maturity vehicle liquidator.  (See Incentive Award Declaration of

Green Spot Motors Co., Appendix B, Ex. 18 (assisted experts to evaluate claims and damages); Incentive Award Declaration of Deluxe Holdings, Inc., Appendix B, Ex. 19 (made fleets available for inspection and assisted experts); Incentive Award Declaration of Auto Lenders Liquidation Center, Inc., Appendix B, Ex. 20 (investigated unintended acceleration in company's subject vehicles).)  It should not be surprising that efforts of these commercial entities were more extensive than those of consumers.

Furthermore, there is no evidence that named plaintiffs and class representatives entered into pre-settlement retainer agreements with their counsel such that their actions and decisions on behalf of the class were skewed in favor of settlement rather than continued litigation.  There is no evidence that the incentive awards are conditioned on support for the Settlement or that any individual was threatened with no award if she opposed the Settlement.  (See Berman Decl. ¶ 136.)  Even though named plaintiffs and class representatives will receive monetary awards greater than other members of the class, that is not in itself unreasonable, and the total value of the award here – $395,270 – is minuscule compared to the overall value of the Settlement.  In addition, the amount of any award over $2,000 is conditioned expressly on the time each individual has expended.  There is no other differential treatment.  Thus, there are no skewed incentives like in Staton, where 29 people were to receive $890,000 in incentive awards.

The requested incentive awards also are typical if not lower than those in comparable litigation.  See, e.g., In re U.S. Bancorp Litig., 291 F.3d 1035, 1038

(8th Cir. 2002) (approving $2,000 incentive awards to five named plaintiffs out of a class potentially numbering more than 4 million in a settlement of $3 million); In re Kentucky Grilled Chicken Coupon Mktg. & Sales Practices Litig., 280 F.R.D. 364, 383 (N.D. Ill. 2011) (awarding $25,000 in the aggregate for five class representatives and noting that "an empirical study of incentive awards to class action plaintiffs has determined that the average aggregate incentive award within a consumer class action case is $29,055.20, and that the average individual award is $6,358.80"); In re Diet Drugs (Phentermine, Fenfluramine, Dexfenfluramine) Prods. Liab. Litig., 553 F. Supp. 2d 442, 489-90 (E.D. Pa. 2008) (granting over thirty named plaintiffs $10,000 each in incentive award following $6.4 billion settlement agreement); Ingram v. Coca-Cola Co., 200 F.R.D. 685, 694 (N.D. Ga. 2001) (approving service awards of $300,000 to named plaintiffs for the services provided to the class by responding to discovery, participating in the mediation process, and taking the risk of stepping forward on behalf of the class, where each class member's recovery would average approximately $38,000). The Court therefore finds that the use of a per-hour approach to the award has not created excessive awards for any individual.

In short, nothing indicates that the proposed incentive payments "removed a critical check on the fairness of the class-action settlement, which rests on the unbiased judgment of class representatives similarly situated to absent class members." Radcliffe, 2012 WL 1831760, at *5. The Court finds no structural deficiencies in the global compromise as a result of these payments. See Amchem Prods., Inc. v. Windsor, 521 U.S. 591, 627 (1997) ("The settling parties, in sum, achieved a global compromise with no structural assurance of fair and adequate

1    representation.")

2

3        C.    Conclusion as to Compensation to Named Plaintiffs and Class

4              Representatives

5

6        For the foregoing reasons, the Court tentatively finds that the proposed

7    award of compensation is fair, reasonable, and adequate.  However, the Court

8    cannot complete its analysis before final approval of the Settlement Agreement is

9    granted.

10

11   V.    Conclusion

12

13       For the foregoing reasons, the Court tentatively finds that the proposed

14   award of fees, costs, and compensation is fair, reasonable, and adequate.  The

15   Court will complete its analysis upon granting final approval of the Settlement

16   Agreement.  Accordingly, the Court holds in abeyance the Motion for an Award of

17   Attorneys' Fees, Reimbursement of Expenses, and Compensation to Named

18   Plaintiffs.

19

20       **IT IS SO ORDERED.**

21

22   DATED:    June 17, 2013

23                                    _____

24                                    JAMES V. SELNA
                                      UNITED STATES DISTRICT JUDGE

25